T. E. ALLISON, ROBERT W. DOCKERY, AND ALL OTHER PERSONS SIMILARLY SITUATED, v. C. R. SHARP, REGISTRAR FOR WARD No. 2, IREDELL COUNTY; HUGH G. MITCHELL, CHAIRMAN BOARD OF ELECTIONS OF IREDELL COUNTY; L. P. McLENDON, CHAIRMAN, STATE BOARD OF ELECTIONS; AND THE STATE BOARD OF ELECTIONS OF NORTH CAROLINA.

(Filed 26 February, 1936.)

1. **Elections A a—C. S., 5939, requiring applicant to prove to satisfaction of registrar ability to read and write Constitution held valid.**

The provisions of N. C. Code, 5939, that a person presenting himself for registration shall, before he is registered, prove to the satisfaction of the registrar his ability to read and write any section of the Constitution, is valid, since such qualification is prescribed by the Constitution, Art. VI, sec. 4, and authority therein granted the Legislature to enact general legislation to carry out the provisions of the article, Art. VI, sec. 3, and the provision of the act placing the duty upon the registrar being logical and reasonable, and not constituting class legislation, since its provisions apply to all classes, and there being an adequate remedy at law if a registrar, in bad faith or in abuse of power or discretion, should refuse to register a person duly qualified.

2. **Actions B g—Validity of election statute held properly challenged by this proceeding under Declaratory Judgment Act.**

While the Declaratory Judgment Act does not authorize the bringing of an action not founded upon a legal controversy, and does not authorize the courts to give advisory opinions upon moot or abstract questions, the act specifically authorizes parties whose rights, status, or other legal relations are affected by a statute, ordinance, contract, etc., to obtain a declaration of rights, status, or other legal relations thereunder, and the

act *is held* to afford a means of testing the validity of a statute requiring persons presenting themselves for registration to prove to the satisfaction of the registrar their ability to read or write any section of the Constitution, plaintiffs and all the people of the State being vitally affected by the statute in controversy. N. C. Code, 628 (b) (h).

DEVIN, J., took no part in the consideration or decision of this case.

CONNOR, J., concurs in result.

APPEAL by plaintiffs from *Clement, J.,* at July Term, 1935, of IREDELL. Affirmed.

This is an action, brought by plaintiffs against defendants (under Public Laws 1931, ch. 102, N. C. Code, 1935 [Michie], secs. 628[a], *et seq.,* known as the Uniform Declaratory Judgment Act), for the purpose of declaring unconstitutional N. C. Code, 1935 (Michie), sec. 5939. The defendants demurred to the complaint. The court below sustained the demurrer and plaintiffs excepted and assigned error, and appealed to the Supreme Court.

*W. Avery Jones and Hosea V. Price for plaintiffs.*
*Attorney-General Seawell and Assistant Attorney-General Aiken for defendants.*

CLARKSON, J. The question involved: Is the act in question, N. C. Code, 1935 (Michie), sec. 5939, unconstitutional? We think not.

As to the demurrer of defendants on the ground of misjoinder of parties plaintiff and defendant to the action, we do not think it necessary to consider.

The Uniform Declaratory Judgment Act (N. C. Code, 1935 [Michie], sec. 628[2]), is as follows: "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree."

Section 628(b) is as follows: "Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise, and obtain a declaration of rights, status, or other legal relations thereunder. A contract may be construed either before or after there has been a breach thereof."

Section 628(h), in part, is as follows: "In any proceeding which involves the validity of a municipal ordinance or franchise, such municipality shall be made a party, and shall be entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the Attorney-General of the State shall also be served with a copy of the proceeding and be entitled to be heard." *Edgerton v. Hood, Comr.,* 205 N. C., 816; *Wright v. McGee,* 206 N. C., 52; *Farnell v. Dongan,* 207 N. C., 611; Borchard on Declaratory Judgments, p. 549, par. 2.

The following and other constitutional amendments were submitted to the people of this State—Acts of General Assembly of North Carolina, Adjourned Session 1900, passed on 13 June, 1900, and ratified at General Election, 1900. We give in part the Suffrage Amendment of 1900 material to be considered in this controversy:

"Sec. 1. Every male person born in the United States, and every male person who has been naturalized, twenty-one years of age, and possessing the qualifications set out in this article, shall be entitled to vote at any election by the people of the State, except as herein otherwise provided.

"Sec. 2. He shall have resided in the State of North Carolina for two years, in the county six months, and in the precinct, ward, or other election district in which he offers to vote, four months next preceding the election; *Provided,* that removal from one precinct, ward, or other election district to another in the same county shall not operate to deprive any person of the right to vote in the precinct, ward, or other election district from which he has removed until four months after such removal. No person who has been convicted, or who has confessed his guilt in open court upon indictment, of any crime, the punishment of which now is, or may hereafter be, imprisonment in the State's Prison, shall be permitted to vote, unless the said person shall be first restored to citizenship in the manner prescribed by law.

"Sec. 3. Every person offering to vote shall be at the time a legally registered voter as herein prescribed, and in the manner hereafter provided by law, and the General Assembly of North Carolina shall enact general registration laws to carry into effect the provisions of this article.

"Sec. 4. Every person presenting himself for registration shall be able to read and write any section of the Constitution in the English language; and before he shall be entitled to vote, he shall have paid, on or before the first day of May of the year in which he proposes to vote, his poll tax for the previous year, as prescribed by Article V, section 1, of the Constitution," etc.

The residence under the above Suffrage Amendment in the State has been reduced to one year, and the poll tax provision has been eliminated. Const. N. C., Art. VI, secs. 1 and 2. *S. v. Carter,* 194 N. C., 293.

To carry into effect the above Suffrage Amendment, the General Assembly (1901, ch. 89) enacted "An act to provide for the holding of elections in North Carolina." Sec. 12, in part, is as follows: "Every person presenting himself for registration shall be able to read and write any section of the Constitution in the English language, and shall show to the satisfaction of the registrar his ability to read and write any such section when he applies for registration, and before he is registered." The Constitution above set forth and the above statute have been unquestioned law of this State for over a third of a century.

The Constitution and act of the General Assembly which we are called upon to construe are:

(1) Article VI, sec. 4, of the Constitution of North Carolina, in part: "Every person presenting himself for registration shall be able to read and write any section of the Constitution in the English language," etc. The provisos we do not quote, as they are immaterial, the time limit having expired—1 December, 1908.

(2) N. C. Code, 1935 (Michie), sec. 5939, in part: "Every person presenting himself for registration shall be able to read and write any section of the Constitution in the English language, and shall show to the satisfaction of the registrar his ability to read and write any such section when he applies for registration, and before he is registered," etc. This act was passed (Public Laws 1901, ch. 89, part sec. 12) to carry into effect the provisions of Article VI, sec. 4, and other provisions of the Constitution of 1900, *supra.*

The language of the Constitution is mandatory that "every person presenting himself for registration *shall* be able to read and write any section of the Constitution in the English language," etc. The Constitution says "presenting himself for registration." Someone has to determine whether or not the person shall be able to read and write any section of the Constitution in the English language. Section 5939, *supra,* puts this duty on the registrar "to show to the satisfaction of the registrar his ability to read and write any such section when he applies for registration and before he is registered." The Constitution gives the General Assembly the right to enact this legislation. Laws 1900, *supra,* part sec. 3: "And the General Assembly of North Carolina shall enact general registration laws to carry into effect the provisions of this article." This gives in clear and unmistakable language the right to the General Assembly to pass the act complained of—sec. 5939, *supra.* This is unquestionably a reasonable provision, and the registrar is the logical person to carry out the provisions of the Constitution. Then, again, the registrar has to pass on other qualifications of the voter contained in the Constitution.

We think the act of the General Assembly is constitutional. If a registrar, in bad faith or in abuse of power or discretion, should refuse

to register one duly qualified, that is when they come within this consti-
tutional requirement and other provisions of the Constitution as to age,
residence, sanity, citizenship, etc., then there is a remedy provided by
law. The act of the General Assembly is no class legislation, but appli-
cable to all the citizens of the State. In fact, in the final analysis,
plaintiffs do not challenge the constitutionality of Article VI, sec. 4, but
only the statute passed to carry into effect the provisions of that section
of the Constitution. It seems that so far as plaintiffs are concerned, the
action is moot or academic. The plaintiffs seek no affirmative relief
whatsoever in the action, allege no bad faith or abuse of power or discre-
tion on the part of the defendant Sharp, the registrar, but just do not
like the law of their State. The only relief prayed for in their com-
plaint is that section 5939, *supra,* be declared unconstitutional.

The Uniform Declaratory Judgment Act "does not extend to the sub-
mission of the theoretical problem or a 'mere abstraction,' " and "it is no
part of the function of the courts, in the exercise of the judicial power
vested in them by the Constitution, to give advisory opinions, or to
answer moot questions, or to maintain a legal bureau for those who may
chance to be interested, for the time being, in the pursuit of some aca-
demic matter." *Stacy, C. J.,* in *Poore v. Poore,* 201 N. C., 791 (792).
To the same effect see *Carolina Power and Light Co. v. Iseley,* 203
N. C., 811. Nor is an *ex parte* proceeding brought to determine the
petitioner's racial status within the scope or purview of the act. *Ex
parte Eubanks,* 202 N. C., 357.

In the T.V.A. decision, delivered by *Chief Justice Hughes* of the
U. S. Supreme Court (17 February, 1936), the same principle is de-
clared: "The judicial power does not extend to the determination of
abstract questions. . . . Claims based merely upon 'assumed poten-
tial invasions' of rights are not enough to warrant judicial intervention.
*Arizona v. California,* 283 U. S., 423, 462. The act of 14 June, 1934,
providing for declaratory judgments, does not attempt to change the
essential requisites for the exercise of judicial power. By its terms, it
applies to 'cases of actual controversy,' a phrase which must be taken
to connote a controversy of a judicial nature, thus excluding an advisory
decree upon a hypothetical state of facts."

However, in the instant case, the plaintiffs and all the people of the
State are vitally affected by the statute in controversy. While there
was another remedy at law available to them, they have challenged the
constitutionality of the statute under which they contend that the
registrar refused them registration. Under such circumstances and
conditions, the Uniform Declaratory Judgment Act affords a ready
means of testing its validity, as pointed out in Borchard's Declaratory
Judgments, p. 549, as follows: "In countries, and especially in federal
states, where the constitutionality or validity of statutes and ordinances

16—209

can be judicially challenged, and where the declaratory judgment is known, it is a regular practice to use this simple device to attack the constitutionality or validity, or the construction or interpretation, of a statute or municipal ordinance. Section 2 of the Uniform Declaratory Judgment Act specifically authorizes any person affected by 'a statute, municipal ordinance, contract, or franchise,' to have determined 'any question of construction or validity' thereunder, and section 11 provides that 'In any proceeding which involves the validity of a municipal ordinance or franchise, such municipality shall be made a party, and shall be entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the Attorney-General of the State shall also be served with a copy of the proceeding and be entitled to be heard.' "

It would not be amiss to say that this constitutional amendment providing for an educational test (ratified by the people of the State at the general election of 1900, by vote of 182,217 for and 128,285 against), brought light out of darkness as to education for all the people of the State. Religious, educational, and material uplift went forward by leaps and bounds.

|  | 1900 | 1934 |
|---|---|---|
| Value of white school property.. | $839,269 | $94,910,979 |
| Value of colored school property | 258,295 | 12,170,324 |
| White teachers and principals | 5,753 | 16,815 |
| Colored teachers and principals | 2,567 | 6,531 |
| White enrollment | 270,447 | 614,784 |
| Colored enrollment | 130,005 | 280,741 |

The State now educates 895,525 children between the ages of 6 and 21 years—Const. of N. C., Art. IX, sec. 2. 614,784 white and 280,741 colored. The rich and poor, the white and colored, alike have an equal chance and opportunity for an elementary and high school education. It may be of interest to state that this Commonwealth has an eight-months school, under State control, and is now being operated without a cent of tax on land. It goes without saying that judging the future by the past the school system will naturally improve as the years go by.

For the reasons given, the judgment of the court below is
Affirmed.

DEVIN, J., took no part in the consideration or decision of this case.

CONNOR, J., concurs in result.