NORTH CAROLINA CONSUMERS POWER, INC. AND THE CITY OF SHELBY, A MUNICIPAL CORPORATION OF THE STATE OF NORTH CAROLINA, PETITIONERS-PLAINTIFFS v. DUKE POWER COMPANY; ROBERT W. YELTON, N. DIXON LACKEY, JR., GEORGE C. NEWMAN AND EARL D. HUNNEYCUTT, JR., INDIVIDUALLY AND AS CITIZENS, ELECTRIC CUSTOMERS AND TAXPAYERS OF THE CITY OF SHELBY, NORTH CAROLINA, RESPONDENTS-DEFENDANTS, AND CHARLES R. McBRAYER; ALI PAKSOY; VARIETY THEATRES, INC., DOING BUSINESS AS SKYVIEW DRIVE IN THEATRE; BELK BROTHERS COMPANY; BURLINGTON INDUSTRIES, INC.; FIBER INDUSTRIES, INC.; CITY OF WILSON; CITY OF GASTONIA; TOWN OF CORNELIUS; CITY OF CHARLOTTE; AND ATTORNEY GENERAL OF NORTH CAROLINA, ADDITIONAL RESPONDENTS-DEFENDANTS

No. 87

(Filed 1 July 1974)

1. **Appeal and Error § 6— refusal to dismiss action — no right of appeal**

No appeal lies from the trial court's refusal to dismiss an action on the ground of lack of a justiciable controversy since such refusal did not seriously impair any right of defendant that could not be corrected upon appeal from final judgment.

2. **Declaratory Judgment Act § 2; Rules of Civil Procedure § 12— motion to dismiss — declaratory judgment action**

A motion to dismiss pursuant to Rule 12(b)(6) is seldom an appropriate pleading in actions for declaratory judgments; such motion will not be allowed simply because the plaintiff may not be able to prevail but is allowed only when the record clearly shows that there is no basis for declaratory relief as when the complaint does not allege an actual, genuine existing controversy.

3. **Declaratory Judgment Act § 1; Injunctions § 11; Parties § 5— enjoining municipality — declaratory judgment on validity of municipal contract — class actions**

A citizen-taxpayer may maintain a class action to enjoin the governing body of a municipal corporation from transcending its lawful powers or violating any legal duty which will injuriously affect the taxpayer; and class actions for declaratory judgments may be utilized to determine the validity of contracts between a municipality and a private corporation.

4. **Declaratory Judgment Act § 1— actual controversy — litigation unavoidable**

While it is not necessary for one party to have an actual right of action against another for an actual controversy to exist which would support declaratory relief, it is necessary that the courts be convinced that the litigation appears to be unavoidable.

5. **Declaratory Judgment Act § 1— validity of contract — lack of justiciable controversy**

There was no actual or real presently existing controversy between plaintiffs and defendants in an action brought by N. C. Consumers

Power, Inc. and a city against Duke Power Company and citizens, electric customers and taxpayers of the city to obtain a declaratory judgment as to the validity of a "System Development and Power Sales Contract" entered between the two plaintiffs where the citizens-taxpayers joined in plaintiffs' prayer for relief without denying any substantial allegations of the complaint, and the complaint reveals that there is no practical certainty that plaintiffs have the capacity or power to perform the acts which would inevitably create a controversy with Duke Power Company.

THIS is an action for a declaratory judgment instituted by Consumers Power Company, a nonprofit North Carolina corporation (hereinafter referred to as Consumers), and the City of Shelby, a municipal corporation (hereinafter referred to as Shelby), against Duke Power Company, a North Carolina corporation (hereinafter referred to as Duke), and Robert W. Yelton, N. Dixon Lackey, Jr., George C. Newman and Earl D. Hunneycutt, Jr., individually and as citizens, electric customers and taxpayers of the City of Shelby.

The Petition and Complaint allege that Shelby now owns and operates an electric distribution system and purchases its electric bulk requirements from Duke Power Company; that Consumers was organized to seek and receive governmental approvals for, and to proceed to design, finance, construct and acquire electric generation and transmission facilities, and to own and operate such facilities so as to provide power to municipalities and others who own electric distribution systems.

Petitioners-plaintiffs further allege that Consumers and Shelby have executed a "System Development and Power Sales Contract" (Exhibit C-1) (hereinafter referred to as System Contract) and similar contracts have been tendered to 45 other North Carolina municipalities and North Carolina Electric Membership Corporation, representing 30 electric membership corporations (these parties, with their respective percentage shares of participation, are listed in Exhibit "A" to the System Contract); that the facilities which Consumers intends to construct and operate would furnish a competing source of wholesale electric energy to customers now served by Duke and other power companies; that Duke has committed itself to oppose the construction and operation of proposed facilities; that it is inevitable that Duke and petitioners-plaintiffs must litigate the validity of the contractual arrangements and the authority of Consumers Power to finance, construct and operate electric generation and transmission facilities; and that Shelby has now so

Consumers Power v. Power Co.

committed itself that any citizen, electric ratepayer or taxpayer may challenge the contract between Consumers and Shelby.

Petitioners-plaintiffs prayed for a judgment declaring that Consumers and Shelby have the power to enter into the System Contract and to perform the obligations therein required; that the action be declared a class action and the Court make provisions for proper representation of the class; and that the Court provide adequate notice to the parties. The prayer for relief also posed certain specific questions related to the System Contract to be answered by the Court.

Judge Friday found the action to be a class action, and enlarged the class by ordering that additional respondents be joined in the action.

Duke filed a Motion to Dismiss on 12 April 1973 and filed an Amended Motion to Dismiss on 20 April 1973. On the latter date Duke also filed its Answer. The Motions to Dismiss were on the grounds of lack of a justiciable controversy. On 30 May 1973 Judge Friday denied Duke's Motions to Dismiss. On 7 August 1973 Duke gave Notice of Appeal. On 29 August 1973 Duke filed a Petition for Certiorari to the North Carolina Court of Appeals for review of the trial judge's Order denying its Motions to Dismiss. Plaintiffs-petitioners filed an Answer to this Petition for Certiorari on 7 September 1973, and on the same date moved to dismiss Duke's appeal. On 17 September 1973 the Court of Appeals denied petitioners-plaintiffs' Motion to Dismiss Duke's appeal, and on the same date denied Duke's Petition for Certiorari.

After stating the facts the Court of Appeals rendered the following decision:

"CAMPBELL, Judge.

We are of the opinion that this entire project presently is too ephemeral and that the interest of Shelby is too infinitesimal for the Court to take jurisdiction. In other words, the case does not present a justiciable matter.

Reversed.

Judge HEDRICK concurs.

Judge VAUGHN dissents."

Petitioners-plaintiffs appealed pursuant to G.S. 7A-30(2).

*Crisp, Bolch & Smith by Thomas J. Bolch; Tally & Tally by J. O. Tally, Jr., and James D. Garrison; Wood, Dawson, Love & Sabatine, of counsel for plaintiffs-appellants.*

*Joyner & Howison by R. C. Howison, Jr.; and William I. Ward, Jr., of counsel; Fleming, Robinson & Bradshaw by Robert W. Bradshaw, Jr.; and Horn, West, Horn & Wray for defendant-appellee.*

BRANCH, Justice.

[1] At the threshold of this appeal we are confronted with the question of whether an appeal lies from the trial judge's refusal to dismiss the action.

G.S. 1-277 in effect provides that no appeal lies to an appellate court from an interlocutory order or ruling of the trial judge unless such ruling or order deprives the appellant of a substantial right which he would lose if the ruling or order is not reviewed before final judgment. *Raleigh v. Edwards,* 234 N.C. 528, 67 S.E. 2d 669; *Veazey v. Durham,* 231 N.C. 357, 57 S.E. 2d 377.

Many decisions of this Court hold that refusal of a Motion to Dismiss is not a final determination within the meaning of the statute and, therefore, is not appealable. *G.M.C. Trucks v. Smith,* 249 N.C. 764, 107 S.E. 2d 746; *Cox v. Cox,* 246 N.C. 528, 98 S.E. 2d 879; *Johnson v. Pilot Life Ins. Co.,* 215 N.C. 120, 1 S.E. 2d 381; *Clements v. Southern R. R.,* 179 N.C. 225, 102 S.E. 399; *Plemmons v. Southern Improvement Co.,* 108 N.C. 614, 13 S.E. 188.

*Johnson v. Pilot Life Ins. Co., supra,* was an action to set aside a release and recover on an insurance policy. The insurer appealed from an Order denying its Motion to Dismiss. The Court dismissed the appeal, and Chief Justice Stacy, writing for the Court, stated:

> "No appeal lies from a refusal to dismiss an action. *Goldsboro v. Holmes,* 183 N.C., 203, 111 S.E., 1; *Farr v. Lumber Co.,* 182 N.C., 725, 109 S.E., 383; *Goode v. Rogers,* 126 N.C., 62, 35 S.E., 185. In such case there is no judgment—only the refusal of a judgment. *Branshaw v. Bank,* 172 N.C., 632, 90 S.E., 789. Of course, if the motion had been allowed and the action dismissed, the plaintiff could

not have proceeded in the court below, and in that event an appeal by the plaintiff would have been in order. *Royster v. Wright,* 118 N.C., 152, 24 S.E., 746. Such a ruling would have been just the reverse of the one we are now considering. *Batson v. Laundry, supra.*"

\* \* \*

" 'It is only when the judgment or order appealed from in the course of the action puts an end to it, or may put an end to it, or has the effect to deprive the party complaining of some substantial right, or will seriously impair such right if the error shall not be corrected at once, and before the final hearing, that an appeal lies before final judgment.' *Merrimon, J.,* in *Leake v. Covington,* 95 N.C., 193."

Duke relies upon the cases of *Kilby v. Dowdle,* 4 N.C. App. 450, 166 S.E. 2d 875, and *Elliott v. Ballentine,* 7 N.C. App. 682, 173 S.E. 2d 552, to support its contention that the denial of its Motions to Dismiss is immediately appealable.

*Kilby* is distinguishable from the case before us. In *Kilby* plaintiff instituted an action to recover for personal injuries allegedly resulting from the negligent operation of a motor vehicle owned by defendant, Carolina Truck and Body Company, Inc., and operated by its employee Dowdle. Defendant, Carolina Truck and Body Company, alleged, as a plea in bar, that plaintiff was its employee at the time of the accident and that the North Carolina Industrial Commission had exclusive jurisdiction of the claim. The trial judge overruled the plea in bar and set the cause for trial.

Defendant Truck Company appealed from this ruling, and the Court of Appeals held that an appeal lies immediately from refusal to dismiss a cause of action for *want of jurisdiction.* However, no such jurisdictional question arises in instant case.

We are unable to find a valid distinction between instant case and *Elliott.* In *Elliott* the cause of action involved an interpretation of a will under the Declaratory Judgment Act. Defendants demurred on the grounds that the complaint did not state a cause of action, and that there was a misjoinder of parties and causes of action. The trial court overruled the demurrer, and the Court of Appeals considered defendant's appeal. It would seem that the holding in *Elliott* would, by implication, support Duke's position. On the other hand, the Court of Appeals in the later case of *Acorn v. Knitting Corp.,* 12 N.C. App. 266, 182

S.E. 2d 862, flatly held, and we think correctly so, that no immediate right of appeal lay from the trial court's order denying defendant's Motion to Dismiss because of a prior action pending in another jurisdiction between the same parties. In dismissing the action the Court, *inter alia,* quoted from *Johnson v. Pilot Life Ins. Co., supra,* the following: "No appeal lies from a refusal to dismiss an action."

Judge Friday's refusal to allow Duke's Motion to Dismiss did not put an end to the action or seriously impair any substantial right of Duke that could not be corrected upon appeal from final judgment. The Court of Appeals incorrectly denied petitioners-plaintiffs' Motion to Dismiss Duke's appeal. Nevertheless since the Court of Appeals decided this case upon its merits and because we believe that decision of the principal question presented would expedite the administration of justice, we elect, in the exercise of our supervisory jurisdiction, to consider the principal question. *Moses v. State Highway Commission,* 261 N.C. 316, 134 S.E. 2d 664; *Allred v. Graves,* 261 N.C. 31, 134 S.E. 2d 186.

We are thus brought to the consideration of whether the trial judge correctly denied defendant's Motion to Dismiss.

[2]  A Motion to Dismiss pursuant to Rule 12(b)(6) performs the same function as the old common law general demurrer. *Sutton v. Duke,* 277 N.C. 94, 176 S.E. 2d 161. Thus well pleaded allegations in the Complaint and such relevant inferences of fact which might be deduced therefrom are taken as true. The Motion to Dismiss will be allowed only when the Complaint affirmatively shows that plaintiff has no cause of action. *Forrester v. Garrett, Comr. of Motor Vehicles,* 280 N.C. 117, 184 S.E. 2d 858; *Sutton v. Duke, supra.* The Motion is seldom an appropriate pleading in actions for declaratory judgments, and will not be allowed simply because the plaintiff may not be able to prevail. It is allowed only when the record clearly shows that there is no basis for declaratory relief as when the complaint does not allege an actual, genuine existing controversy. *Machine Company v. Newman,* 275 N.C. 189, 166 S.E. 2d 63; *Woodard v. Carteret County,* 270 N.C. 55, 153 S.E. 2d 809; *Walker v. Charlotte,* 268 N.C. 345, 150 S.E. 2d 493; *Hubbard v. Josey,* 267 N.C. 651, 148 S.E. 2d 638; *Insurance Company v. Roberts,* 261 N.C. 285, 134 S.E. 2d 654; 22 Am. Jur. 2d, *Declaratory Judgments,* § 91, (1965).

Since this action is bottomed on the System Contract (Exhibit C-1) between Consumers and Shelby we quote pertinent

portions of the contract to which reference will hereinafter be made:

### ARTICLE I: PREAMBLE AND PREMISES

#### *Section 1.01 Preamble*

" . . . Consumers Power and the municipal and EMC Participants also desire and intend to provide for the bulk power requirements of the Participants which are in excess of the capability of the Consumers Power system. This will be done through various methods, including assumption by Consumers Power of rights and obligations of Participants in any contracts with other bulk power suppliers at the time Consumers Power goes into commercial operation, purchase and resale of supply from other bulk power suppliers and, if such proves feasible and desirable, by N. C. EMC's acquisition of power generation or transmission facilities and their utilization on an integrated basis with the Consumers Power facilities. . . .

\* \* \*

Several years will be required to bring the proposed initial system of Consumers Power to reality. Numerous governmental approvals will be required; planning, designing, financing and construction must be arranged for and completed. These interim measures will of course require substantial expenditures, which Consumers Power will fund by issuance of its short-term obligations that will be refinanced by the issuance of long-term obligations.

\* \* \*

#### *Section 1.02 Premises*

\* \* \*

(6) Additional work and proceedings are required in order (a) to obtain from the North Carolina Utilities Commission a certificate of convenience and necessity . . . , (b) to obtain other governmental approvals, permits and licenses required in connection with the Initial System, . . . and (c) to firmly establish the engineering, legal and financial feasibility of the Initial System sufficient to support long-term financing of the cost of the Initial System. . . .

\* \* \*

(7) It will be necessary, in order to enable Seller to issue its bonds, notes or other evidences of indebtedness

to pay the costs of acquiring and constructing the Initial System, to have binding contracts with the Participants.

*       *       *

(9)  Seller proposes to enter into agreements with the other Participants containing terms and conditions substantially identical to those contained herein.

*       *       *

(12)  Seller and Participants desire and intend by this and other substantively similar agreements to provide for the Participants' payment for, and for the performance by the Seller of, first, the services necessary to secure required governmental approvals for, and to plan, design, finance and construct to point of commercial operation, the Initial System, . . . ; and, second, all services thereafter necessary in furnishing bulk power supply to the Participants, . . . .

## ARTICLE II

### DEFINITIONS; EXHIBITS

*Section 2.01  Definitions and Explanation of Terms*

*       *       *

(p)  'Participants' means those entities which are specified in Exhibit A.

*       *       *

## ARTICLE III

### SYSTEM DEVELOPMENT SERVICES

*Section 3.01  System Development Services to Be Performed by Seller*

. . . As soon as practicable, the Seller will in good faith use its best efforts to finance, to complete the design for, and to construct to completion the Initial System. The Seller will use its best efforts to obtain, by January 1, 1977, all such necessary governmental approvals, and to cause the Date of Commercial Operation of the Initial System to occur by January 1, 1983. . . .

*       *       *

*Section 3.02  Payment by Participant for System Development Service*

*       *       *

(b) . . . [T]he Seller shall prepare and submit to the Participant a Billing Statement showing the amount to be paid by the Participant in and for such Year for services rendered pursuant to Section 3.01. Such amount shall be the Participant's Share of the Annual Initial System Development Service Costs. Such payment shall be made by the Participant to the Seller in and for each such Year without regard to the outcome of the work performed by Seller pursuant to Section 3.01 hereof or to the progress made by Seller in such performance (whether or not affected by Uncontrollable Forces) ; . . .

### ARTICLE IV

### SALE AND PURCHASE OF INITIAL SYSTEM POWER SUPPLY

*Section 4.01 Sale and Purchase*

Seller shall sell, and the Participant shall purchase, Participant's Share of the Initial System Capability and the Participant's Entitlement Share during each Power Supply Year during the term of this Contract.

\* \* \*

*Section 4.02 Payments*

(a) Billing Statement. . . . Seller shall prepare and submit to Participant a Billing Statement showing the Participant's Share of Initial System Fixed Charges in the forthcoming Power Supply Year or balance of such Year. Participant shall pay its Participant's Share of such amount, . . . .

\* \* \*

### ARTICLE V

### SALE AND PURCHASE OF TOTAL FIRM POWER SUPPLY

*Section 5.01 Total Firm Power Supply to the Participant*

(a) In each of the initial five Power Supply Years and, subject to Participant's right to terminate solely with respect to the provisions of this Article V relating to Additional Power Requirements, as hereinafter provided, in each such Year thereafter, Seller shall, on a firm basis, obtain or furnish, deliver or cause to be delivered, and sell, and Participant shall receive and pay for, Participant's total power supply requirements, . . . .

* * *

(d) In pursuance of the rights and obligations in this Article contained, Participant shall (1) contemporaneously with the effectiveness of this agreement or at such subsequent time or times as Seller shall specify, transfer and assign to Seller, in whole or in part, such of any then existing contracts between Participant and any other bulk power supplier as may be necessary or desirable to enable Seller to exercise its rights and to perform its obligations set forth in this agreement and in similar agreements with other Participants; (2) enter into such supplemental contract or contracts with Seller or any other bulk power supplier, whose terms and provisions shall not be inconsistent with this agreement, as may be necessary or desirable to enable Seller and Participant fairly, reasonably and equitably to exercise and perform their respective rights and obligations under this Article; and (3) enter into no new contract, or modification or amendment of a contract, with any other bulk power supplier without the prior written consent and approval of the Seller, which consent and approval shall not be withheld by the Seller if such new contract, or modification or amendment of a contract, is not inconsistent with the provisions of this agreement.

(e) From and after the effectiveness of this agreement, neither Seller nor Participant shall enter into any new contract or permit any then or thereafter existing contract to be renewed or extended . . . , or enter into any amendment to or modification of such a contract, with any other bulk power supplier which shall preclude or impair the ability of Seller or Participant to exercise and perform their respective rights and obligations under this Article or any other provisions of this agreement.

(f) . . . Seller, for the purpose of carrying out its rights and obligations under this Article, shall be, and Participant hereby designates and appoints Seller, Participant's sole agent to the fullest legal extent that such agency may for such purpose be established.

ARTICLE IX

TERMS; MISCELLANEOUS PROVISIONS

*Section 9.01 Term of Agreement*

This agreement shall be effective upon execution by both parties and, except as provided in Section 9.03 and

except as to accrued obligations and liabilities, shall terminate thirty (30) years after the first day of the initial Power Supply Year.

\*          \*          \*

*Section 9.03  Termination of the Initial System*

The Seller may terminate all or any portion of its activities with respect to the planning, designing, financing, acquisition, construction or operation of the Initial System, or of any generating station or other component thereof, . . . if and when (a) the Seller determines it is unable to construct, operate, or proceed as owner of the Initial System or any component thereof because of its inability to obtain any required governmental approvals or because of other licensing, financing, or operating conditions or other causes which are beyond its control; or (b) the Seller and the Participants (by majority vote of the Participants' Advisory Committee) determine that the Initial System or any component thereof is not capable of producing energy consistent with Prudent Utility Practice. The Seller shall not be obligated to terminate the entire Initial System or any particular component thereof by reason of its inability to construct, operate or proceed as owner of any other part of the Initial System unless it is determined pursuant to clause (b) above that the remaining components of the Initial System are not capable of producing energy consistent with Prudent Utility Practice. The date of termination shall be the earlier of the dates of determination under clauses (a) and (b) above.

Consumers and Shelby contend that the declarations they seek are not related to the feasibility of the generation and transmission of electric power, but are concerned with the validity or invalidity of the System Contract which has been executed by Consumers and Shelby so as to impose present obligations upon the parties to the contract, and that an actual controversy exists between petitioners-plaintiffs and Duke concerning the validity and construction of the System Contract.

In support of their position Consumers and Shelby point to Section 5.01(b) of the contract which designates Consumers as the sole agent of Shelby in negotiating power contracts, effective upon execution of the contract. Further, they note that effective upon its execution, Section 5.01(d) of the System

Contract imposes heavy restrictions upon Shelby's right to contract, including Consumers' right to require Shelby to assign to Consumers its wholesale power contracts. They further contend that the immediate effectiveness of the contract is shown by its provisions which obligate Shelby to purchase its total electric power requirements from Consumers beginning on 1 July 1984. See Contract Sections 4.01 and 5.01 (a). Consumers and Shelby aver that the bilateral and binding nature of the contract is disclosed by those portions of the agreement whereby Consumers agreed to diligently seek to complete preliminary work, and to obtain state and federal governmental approvals to the end that the Initial System be in operation by 1 January 1983. Section 3.01 System Contract. By Section 1.02 (a) of the Contract Consumers proposes to obtain similar contracts from the other participants.

Consumers and Shelby argue that any one of the obligations of the contract could be *ultra vires* (as contended by Duke in its Answer) and that an actual controversy exists which should be decided under the Declaratory Judgment Act.

Duke, on the other hand, contends that the obligations cited by petitioners-plaintiffs as creating an existing contract and presenting subject matter presently adjudicative under the Declaratory Judgment Act are merely incidental to the real and ultimate purpose of the System Contract which is to provide a means whereby 45 municipalities and 28 electric membership corporations may develop, finance, construct and operate an electric generation and transmission system; that each of the participants as shown on Exhibit A to the contract is assigned a participating share to accept and pay for the development and construction of the system, and for delivery of electricity; and that Shelby, possessing a share of only 1.172%, is the only participant presently obligated to bear the expense of planning, designing, constructing and operating the electric generation and transmission facilities. Duke relies upon Sections 1.01 and 1.02 of the System Contract to support its contentions that no substantial portion of the contract will be effective until the system goes into operation. Duke further contends that since the contract contemplates that all expenses of planning, construction and operation of the transmission system shall be borne by participants according to their allotted participating share, it is impossible for Consumers and Shelby to now be involved in a controversy with Duke concerning the construction

and operation of an electric generation and transmission system. See System Contract 1.02(12), 3.02(b), 4.02(a).

The core of this appeal lies in the determination of whether plaintiffs have by their complaint alleged an actual genuine existing controversy.

The purpose of the Declaratory Judgment Act is to settle and afford relief from uncertainty concerning rights, status and other legal relations, and although the Act is to be liberally construed, its provisions are not without limitation. Uniform Declaratory Judgment Act, G.S. 1-253 to 1-267. Since its passage the Act has spawned a host of decisions defining its scope and objectives. The rules of law set forth in these decisions are, as here, often difficult to apply to the facts of a given case.

Many of the now accepted principles concerning the scope of the Declaratory Judgment Act were stated by Justice Ervin in the case of *Lide v. Mears,* 231 N.C. 111, 56 S.E. 2d 404, as follows:

" . . . [The Act] does not undertake to convert judicial tribunals into counsellors and impose upon them the duty of giving advisory opinions to any parties who may come into court and ask for either academic enlightenment or practical guidance concerning their legal affairs. *Tryon v. Power Co.,* 222 N.C. 200, 22 S.E. 2d 450; *Allison v. Sharp,* 209 N.C. 477, 184 S.E. 27; *Poore v. Poore,* 201 N.C. 791, 161 S.E. 532; Anderson on Declaratory Judgments, section 13. This observation may be stated in the vernacular in this wise: The Uniform Declaratory Judgment Act does not license litigants to fish in judicial ponds for legal advice.

"The Act recognizes the need of society 'for officially stabilizing legal relations by adjudicating disputes before they have ripened into violence and destruction of the *status quo.*' Borchard on Declaratory Judgments (2nd Ed.), 4. It satisfies this social want by conferring on courts of record authority to enter judgments declaring and establishing the respective rights and obligations of adversary parties in cases of actual controversies without either of the litigants being first compelled to assume the hazard of acting upon his own view of the matter by violating what may afterwards be held to be the other party's rights or by repudiating what may be subsequently adjudged to be his own obligations. *Tryon v. Power Co., supra; Green v. Cas-*

*ualty Co.*, 203 N.C. 767, 167 S.E. 38; 16 Am. Jur., Declaratory Judgments, section 7; 1 C.J.S., Actions, section 18; Anderson on Declaratory Judgments, section 71.

"While the Uniform Declaratory Judgment Act thus enables courts to take cognizance of disputes at an earlier stage than that ordinarily permitted by the legal procedure which existed before its enactment, it preserves inviolate the ancient and sound juridic concept that the inherent function of judicial tribunals is to adjudicate genuine controversies between antagonistic litigants with respect to their rights, status, or other legal relations. This being so, an action for a declaratory judgment will lie only in a case in which there is an actual or real existing controversy between parties having adverse interests in the matter in dispute. *Etheridge v. Leary*, 227 N.C. 636, 43 S.E. 2d 847; *Tryon v. Power Co., supra; Wright v. McGee*, 206 N.C. 52, 173 S.E. 31; *Light Co. v. Iseley*, 203 N.C. 811, 167 S.E. 56; *In re Eubanks;* 202 N.C. 357, 162 S.E. 769; 16 Am. Jur., Declaratory Judgments, section 9; 1 C.J.S., Actions, section 18; Anderson on Declaratory Judgments, section 22; Borchard on Declaratory Judgments (2d Ed.), 40-48. It necessarily follows that when a litigant seeks relief under the declaratory judgment statute, he must set forth in his pleading all facts necessary to disclose the existence of an actual controversy between the parties to the action with regard to their respective rights and duties in the premises. *Tryon v. Power Co., supra; Light Co. v. Iseley, supra;* 16 Am. Jur., Declaratory Judgments, section 64; 1 C.J.S., Actions, section 18; Anderson on Declaratory Judgments, section 80. If he fails to do this, the other party cannot confer jurisdiction on the court to enter a declaratory judgment by failing to demur to the insufficient pleading. *Wright v. McGee, supra.*"

In the case of *Tryon v. Power Co.*, 222 N.C. 200, 22 S.E. 2d 450, the City of Tryon granted a franchise to Tryon Electric Service Company to supply electric current to the town. Later Duke Power Company succeeded to all rights and obligations under the franchise and ordinance which granted the franchise.

Section 6 of that franchise provided:

" 'Section 6. That if, at any time in the future, the Town of Tryon shall decide to own and operate its own

electrical lighting plant, it may first acquire, either by purchase or condemnation the property of the persons or corporations who shall then be operating and serving the public by virtue of this franchise. If the said town cannot agree with the owners upon the terms of purchase, then it may have said property valued by three commissioners to be appointed by the Judge of the Superior Court, and condemn the same to the public use, as provided by Chapter 86 of the public laws of 1911.' "

The plaintiff asked the Court to render a declaratory judgment construing the contract and franchise and to determine whether or not in the event the Town of Tryon decided to own and operate its own electrical lighting plant it might first acquire, either by purchase or condemnation, the property of defendant corporation.

By an amendment to its pleadings, the plaintiff alleged the following:

" '9. That as long as the questions and differences exist between the plaintiff and the defendant regarding the rights of the plaintiff under the aforesaid contract and franchise, the plaintiff will be seriously handicapped in making financial arrangements to exercise the rights it claims under said contract and franchise, and the plaintiff, therefore, desires to have said questions adjudicated and determined, all to the end that the plaintiff may exercise its rights under said contract and franchise in accordance with the decision of this Court regarding said rights.' "

Defendant power company admitted that the town had asked it to name a price on its properties and that it had declined to do so, and that it had denied the right of the town to condemn. Defendant further admitted that a difference of opinion existed in respect to plaintiff's right to condemn defendant's property, which it denied.

The trial judge allowed the defendant's Motion to Dismiss.

This Court affirmed the ruling of the Superior Court and, in part, stated:

" . . . In marginal cases the rule may be difficult to apply, because it involves a definition, or at least an appraisal, of the term 'controversy,' which must, perhaps, depend upon the individual case; but in the case at bar, the Court does

not feel that such embarrassment exists. A mere difference of opinion between the parties as to whether plaintiff has the right to purchase or condemn, or otherwise acquire the utilities of the defendant—without any practical bearing on any contemplated action—does not constitute a controversy within the meaning of the cited cases."

We find guidance in the rules stated in *Light Co. v. Iseley*, 203 N.C. 811, 167 S.E. 56. There Carolina Power and Light Company brought an action against the City of Raleigh and the residents thereof to determine the validity of a contract between the power company and the city by the terms of which the power company was to change its electric cars to buses. The trial court held that the action was properly brought under the Declaratory Judgment Act. In affirming the trial court, this Court, *inter alia*, stated:

"Where, however, it appears from the allegations of the complaint in an action instituted under the authority and pursuant to the provisions of the act, (1) that a real controversy exists between or among the parties to the action; (2) that such controversy arises out of opposing contentions of the parties, made in good faith, as to the validity or construction of a deed, will or contract in writing, or as to the validity or construction of a statute, or municipal ordinance, contract, or franchise; and (3) that the parties to the action have or may have legal rights, or are or may be under legal liabilities which are involved in the controversy, and may be determined by a judgment or decree in the action, the court has jurisdiction, and on the facts admitted in the pleadings or established at the trial, may render judgment, declaring the rights and liabilities of the respective parties, as between or among themselves, and affording the relief to which the parties are entitled under the judgment.

\*          \*          \*

It is required only that the plaintiff shall allege in his complaint and show at the trial, that a real controversy, arising out of their opposing contentions as to their respective legal rights and liabilities under a deed, will or contract in writing, or under a statute, municipal ordinance, contract or franchise, exists between or among the parties, and that the relief prayed for will make certain that which is uncertain and secure that which is insecure."

[3]   A citizen-taxpayer may maintain a class action to enjoin the governing body of a municipal corporation from transcending its lawful powers or violating any legal duty which will injuriously affect the taxpayer, *Kornegay v. City of Raleigh,* 269 N.C. 155, 152 S.E. 2d 186; *Shaw v. City of Asheville,* 269 N.C. 90, 152 S.E. 2d 139; and class actions for declaratory judgments may be utilized to determine the validity of contracts between a municipality and a private corporation. 22 Am. Jur. 2d *Declaratory Judgments* § 33 (1965) ; Borchard, Declaratory Judgments, 519 (2d ed. 1941) ; *Woodward v. Fox West Coast Theaters,* 36 Ariz. 251, 284 P. 350.

We note, parenthetically, that the question of whether Duke as a taxpayer or the individual citizens-taxpayers might have successfully brought a class action for injunctive or declaratory relief is not presented by this action.

[5]   Clearly there is no controversy between the parties to the contract. The individual citizens-taxpayers have abandoned any vestige of hostility which might have created a justiciable controversy between them and petitioners-plaintiffs by joining in plaintiffs' prayer for relief without denying any substantial allegations of the complaint. The relationship between Duke and the plaintiffs is not as easily catalogued. We cannot say that petitioners-plaintiffs and Duke are engaged in a friendly suit or that they have entered into a collusive agreement to set up a fictitious controversy, as is often the case where parties seek academic enlightenment concerning legal questions. It is clear that Duke will oppose any viable effort by anyone to obtain approval for or to erect and operate a non-taxpaying electric generation and transmission system in competition with it. However, Duke is not a party to the contract before the Court and has not elected to assume the posture of a citizen-taxpayer of Shelby seeking injunctive or declaratory relief. In fact, the pleadings do not reveal that Duke made any objection to or attack upon the contract until it was compelled to file its pleadings.

[4]   It is not necessary for one party to have an actual right of action against another for an actual controversy to exist which would support declaratory relief. However, it is necessary that the Courts be convinced that the litigation appears to be unavoidable. 22 Am. Jur. 2d, *Declaratory Judgments* § 11 (1965).

In Borchard, Declaratory Judgments (2d ed. 1941) at page 39, we find the following:

Consumers Power v. Power Co.

" . . . [N]o wrong need be proved but merely the existence of a claim or record which disturbs the title, peace, or freedom of the plaintiff, so any claims, assertions, challenges, records, or adverse interests, which, by casting doubt, insecurity, and uncertainty upon the plaintiff's rights or status, damage his pecuniary or material interests, establish a condition of justiciability. . . . "

and on page 60 of the same treatise it is stated:

" . . . The imminence and *practical certainty* of the act or event in issue, or the intent, *capacity, and power* to *perform,* create justiciability as clearly as the completed act or event, and is generally easily distinguishable from remote, contingent, and uncertain events that may never happen and upon which it would be improper to pass as operative facts." (Emphasis added.)

[5]    The complaint does not allege that Duke has made any claims or challenges which casts uncertainty upon plaintiffs' rights or liabilities growing out of the System Contract. Duke's overt acts and statements only indicate opposition to the construction and operation of a competitive generation and transmission system.

We are not in accord with Duke's contentions that *all* of the participants must sign contracts before the possibility of a justiciable controversy may exist between petitioners-plaintiffs and Duke. Nevertheless, the complaint reveals that as of now there is no practical certainty that plaintiffs have the capacity or power to perform the acts which would inevitably create a controversy with Duke. Thus it does not appear that litigation between the parties concerning the System Contract is unavoidable.

Taking all of the allegations in the complaint and all relevant deducible inferences therefrom to be true, the complaint affirmatively shows that there is no *actual or real presently existing controversy* between plaintiffs and defendant growing out of their opposing contentions as to the validity and construction of the System Contract.

The decision of the Court of Appeals is

Affirmed.