Exencial Wealth Advisors, LLC v. Downing, 2025 NCBC 18.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

EXENCIAL WEALTH ADVISORS, LLC,

Plaintiff,

v.

JACOB DOWNING,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV036078-590

**ORDER AND OPINION ON
DEFENDANT JACOB DOWNING'S
MOTION TO DISMISS**

1. **THIS MATTER** is before the Court upon Defendant Jacob Downing's Motion to Dismiss (the "Motion"), filed pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Rule(s)") on 7 October 2024 in the above-captioned case.[1]

2. Having considered the Motion, the parties' briefs in support of and in opposition to the Motion, the Complaint[2], the arguments of counsel at the hearing on the Motion, and other appropriate matters of record, the Court hereby **GRANTS** in part and **DENIES** in part the Motion.

> *McAfee & Taft, by Spencer F. Smith and Gatlin C. Squires, and Moore & Van Allen PLLC, by Nader S. Raja and Harry E. Payne, III, for Plaintiff Exencial Wealth Advisors, LLC.[3]*

> *Ratner Law, by Sarah Y. Ratner and Todd Ratner, and Bell, Davis & Pitt, P.A., by Marc E. Gustafson, for Defendant Jacob Downing.*

Brown, Judge.

---

[1] (Def.'s Mot. Dismiss [hereinafter, "Mot."], ECF No. 21.)

[2] (Compl., ECF No. 3.)

[3] This Motion was briefed and argued by William B. Federman and Jessica A. Wilkes of Federman & Sherwood. They were authorized to withdraw as counsel on 18 March 2025. (Order Authorizing Withdrawal Couns. Rec., ECF Nos. 46, 47.)

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

3.     The Court does not make findings of fact when ruling on a motion to dismiss under Rule 12(b)(6).     Rather, the Court recites the allegations asserted and documents referenced in the challenged pleading—here, the Complaint—that are relevant and necessary to the Court's determination of the Motion.

4.     Plaintiff Exencial Wealth Advisors, LLC ("Exencial" or "Plaintiff") is an Oklahoma limited liability company with its principal place of business in Oklahoma City.[4]  Exencial has at least one member that is a resident of North Carolina.[5]

5.     Defendant Jacob Downing ("Downing" or "Defendant") is a resident of Mecklenburg County, North Carolina.[6]  Downing began working at Exencial's Charlotte, North Carolina, office in May 2021 and entered into an employment agreement with Exencial on 5 May 2021 (the "Employment Agreement").[7]  The Employment Agreement is governed by Oklahoma law.[8]

---

[4] (Compl. ¶ 1.)

[5] (Compl. ¶ 1.)

[6] (Compl. ¶ 2.)

[7] (Compl. ¶ 8.)  Downing disputes whether the "purported [employment] contract is bona fide and signed by Downing" as he "has no recollection nor record that he signed any employment agreement with Exencial."  (Br. Supp. Def. Jacob Downing's Mot. Dismiss [hereinafter, "Br. Supp."] 2 n.2, ECF No. 23.)  As the authenticity of the Employment Agreement is not directly at issue in the Motion, and furthermore is ultimately a question of fact to be decided by the finder of fact, this Court will assume the Employment Agreement is bona fide for purposes of this Order and Opinion.

[8] (Compl. ¶ 5.)

6.     By signing the Employment Agreement, Downing agreed to comply with the non-solicitation and confidentiality provisions contained in the Employment Agreement.[9]  Generally, these provisions prohibited Downing from: (1) "disclos[ing,] reproduc[ing], us[ing], or disseminat[ing] in any manner" the Confidential Information of Exencial or its customers and (2) "solicit[ing] or attempt[ing] to solicit any Exencial customer or prospective customer for the purpose of providing competing services to such customer" for a period of twenty-four months following his termination, unless he chose to exercise the purchase option in the Employment Agreement.[10]

7.     Downing resigned from his position at Exencial on 22 March 2024 and began employment at Cary Street Partners, LLC in Charlotte, North Carolina.[11]  Soon thereafter, on 27 March 2024, Exencial filed suit against Downing and Cary Street Partners in the Oklahoma County District Court (the "Oklahoma Lawsuit").[12]  In the

---

[9] (Compl. ¶¶ 9–15.)

[10] (Compl. ¶¶ 9, 14; *see also* Index Materials Submitted Supp. Def.'s Mot. Dismiss Ex. 22.1, Summons & Compl. filed on Mar. 27, 2024, in Okla. Dist. Ct. Ex. A [hereinafter, "Emp. Agmt."], ECF No. 22.1.)  Despite referencing the Employment Agreement throughout their Complaint and stating that the Employment Agreement was attached as Exhibit 1 to the Complaint, Plaintiff neglected to attach the Employment Agreement to their Complaint.  The Employment Agreement under dispute was provided to the Court by Defendant as part of Exhibit 22.1, titled "Summons and Complaint filed on March 27, 2024, in Oklahoma District Court," in the Index of Materials Submitted in Support of Defendant's Motion to Dismiss. Unless otherwise defined, the capitalized terms in this Order and Opinion refer to those terms as used in the Employment Agreement.

[11] (Compl. ¶¶ 16, 20.)

[12] (*Exencial Wealth Advisors, LLC v. Jacob Downing, et al.*, Case No. CJ-2025-2015 (Okla. Cty. Dist. Ct. March 27, 2024); Index Materials Submitted Supp. Def.'s Mot. Dismiss Ex. 22.1, Summons & Compl. filed on Mar. 27, 2024, in Okla. Dist. Ct. [hereinafter, "Okla. Compl."], ECF No. 22.1; *see also* Br. Supp. 1.)

Oklahoma Lawsuit complaint, Exencial alleged that "[i]mmediately upon resignation or shortly thereafter, Defendant Downing began soliciting Exencial's clients."[13] Additionally, Exencial alleged:

> Defendant Downing removed Exencial owned and developed Confidential Information and sent it to his personal, non-work email, and stored Confidential Information on his personal laptop or computer in violation of his Employment Agreement . . . Prior to his resignation it is believed that Defendant Downing shared Confidential Information with his new employer Cary Street Partners . . . .[14]

Due to the above purported violations of the Employment Agreement, Exencial brought causes of action against Downing for breach of contract and tortious interference with business relationships.[15]

8.      Downing moved to dismiss the complaint in the Oklahoma Lawsuit for lack of personal jurisdiction.[16]  In its 12 August 2024 Order, the Oklahoma County District Court granted Downing's motion to dismiss, finding "the Defendant has not 'purposefully availed himself of any benefits of Oklahoma nor directed activities at

---

[13] (Okla. Compl. ¶ 18.)  The complaints filed in the Oklahoma Lawsuit and in the action currently before this Court are substantially the same.  Plaintiff makes a nearly identical allegation in ¶ 17 of the Complaint currently at issue.  ("Immediately upon resignation or shortly thereafter, Defendant began using Exencial's confidential information and soliciting Exencial's clients.")

[14] (Okla. Compl. ¶¶ 20, 22.)  Nearly identical allegations are made in the Complaint filed in the current action.  (Compl. ¶¶ 19–20.)

[15] (Okla. Compl. ¶¶ 24–39.)

[16] (Br. Supp. 1; Index Materials Submitted Supp. Def.'s Mot. Dismiss Ex. 22.2, Order of Dismissal entered by Okla. Dist. Ct. [hereinafter, "Okla. Order of Dismissal"], ECF No. 22.2.)

the residents of the forum' sufficient to warrant personal jurisdiction over Defendant."[17]

9.  Shortly before the dismissal of the Oklahoma Lawsuit, on 5 August 2024, Exencial filed the complaint initiating this action in Mecklenburg County Superior Court (the "Complaint"). This case was thereafter designated a mandatory complex business case and assigned to the undersigned.[18] In the current action, Exencial asserts substantially similar claims against Downing[19] for (i) breach of the Employment Agreement[20]; (ii) tortious interference with business relationships[21]; (iii) misappropriation of trade secrets[22]; and (iv) declaratory judgment that "Defendant has an obligation to refrain from using or sharing Plaintiff's Confidential Information."[23] As a remedy for Downing's alleged conduct and breaches of the Employment Agreement, Exencial requests both injunctive relief and damages.[24]

10.  Downing filed the Motion seeking to dismiss Exencial's Complaint in its entirety on 7 October 2024. After full briefing, the Court held a hearing on the Motion

---

[17] (Okla. Order of Dismissal ¶ 2.)

[18] (Designation Order, ECF No. 1; Assignment Order, ECF No. 2; Reassignment Order, ECF No. 29.)

[19] Cary Street Partners Investment Advisory, LLC, while a defendant in the Oklahoma Lawsuit, is not a party to the current action.

[20] (Compl. ¶¶ 22–29.)

[21] (Compl. ¶¶ 30–37.)

[22] (Compl. ¶¶ 38–46.)

[23] (Compl. ¶¶ 47–51.)

[24] (Compl. ¶¶ 52–65.)

on 15 January 2025 (the "Hearing"), at which all parties were represented by counsel. The Motion is now ripe for resolution.

## II.

## CHOICE OF LAW

11. A "choice of law" contract clause provides "that the substantive laws of a particular state [shall] govern the construction and validity of the contract." *Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 641 (2002). The general rule in North Carolina is that, "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262 (1980). Our courts, however, will not enforce a choice of law provision where:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of applicable law in the absence of an effective choice of law by the parties.

*Cable Tel Servs., Inc.*, 154 N.C. App. at 642–43 (citing Restatement (Second) of Conflict of Laws § 187 (1971)); *see also Bundy v. Com. Credit Co.*, 200 N.C. 511, 516 (1931) (refusing to apply parties' choice of Delaware law because their contractual stipulation was "immaterial" in that the "record [did] not disclose that any transaction took place in Delaware or that the parties even contemplated either the making or the performance of the contract in said State.").

12. Here, the Employment Agreement provides the "Agreement shall be governed by and construed in accordance with the laws of [sic] Oklahoma applicable to agreements made and to be performed in that State."[25] As Oklahoma has a substantial relationship to the parties—Plaintiff is an Oklahoma limited liability corporation headquartered in Oklahoma City—and the application of Oklahoma law is not, on its face, contrary to a "fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue," this Court will apply Oklahoma law to Plaintiff's claims for breach of contract. The parties do not dispute that Oklahoma law governs the interpretation of the Employment Agreement.

13. However, North Carolina law applies to Plaintiff's claims for tortious interference with business relationships and misappropriation of trade secrets as the injury alleged was sustained or suffered in North Carolina. *See, e.g., SciGrip, Inc. v. Osae*, 373 N.C. 409, 420–22 (2020) (stating "this Court's jurisprudence favors the use of the *lex loci* test in cases involving tort or tort-like claims" and applying the *lex loci* test, which requires the use of the law of the state where the injury or harm was sustained or suffered to a claim for misappropriation of trade secrets). North Carolina law also governs Plaintiff's claim for declaratory judgment. *See, e.g., Velleros, Inc. v. Patterson*, 2015 NCBC 15, at *36 (N.C. Super. Ct. Feb. 23, 2015) ("It is well established under North Carolina law that procedural matters are governed by the law of the forum. *See, e.g., Young v. Baltimore & O.R. Co.*, 266 N.C. 458 (1966).

---

[25] (Emp. Agmt. § 10.)

A court's analysis of a claim for declaratory judgment is therefore governed by North Carolina law."). The parties do not dispute that North Carolina law governs Plaintiff's remaining claims.

III.

LEGAL STANDARD

14. When deciding whether to dismiss for failure to state a claim under Rule 12(b)(6), the Court considers "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51 (2016)).

15. "[D]ismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin*, 371 N.C. at 615 (quoting *Wood v. Guilford County*, 355 N.C. 161, 166 (2002)).

16. Under Rule 12(b)(6), "the trial court is to construe the pleading liberally and in the light most favorable to the plaintiff, taking as true and admitted all well-pleaded factual allegations contained within the [pleading]." *Donovan v. Fiumara*, 114 N.C. App. 524, 526 (1994) (cleaned up); *see also, e.g., Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (recognizing that, under Rule 12(b)(6), the allegations of the complaint should be "view[ed] as true and in the light most favorable to the non-moving party") (cleaned up). The claim is not to be dismissed

unless it appears beyond doubt that the non-moving party could prove no set of facts in support of his claim which would entitle him to relief. *U.S. Bank Nat'l Ass'n ex rel. C-BASS Mortg. Loan Asset-Backed Certificates, Series 2006-RP2 v. Pinkney*, 369 N.C. 723, 726 (2017).

17. When analyzing a Rule 12(b)(6) motion, a court may, in addition to the complaint itself, "properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant."[26] *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001). S*ee also Weaver v. Saint Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204 (2007); *Robertson v. Boyd*, 88 N.C. App. 437, 441 (1988); *Haddock v. Volunteers of Am., Inc.*, 2021 NCBC LEXIS 8, at \*9 (N.C. Super. Ct. Jan. 22, 2021).

## IV.

## ANALYSIS

18. Defendant's Motion seeks to dismiss Plaintiff's claims for breach of contract, tortious interference with business relationships, misappropriation of trade secrets, and declaratory judgment.[27] The Court will take up each in turn.

---

[26] It is for this reason that the Court may consider the Employment Agreement filed by Defendants in its determination of this Motion.

[27] (Mot. 1; Br. Supp. 1.) Plaintiff additionally lists claims for injunctive relief and damages under the Causes of Action section of its Complaint. However, as Defendant rightly states in its Brief in Support of Defendant Jacob Downing's Motion to Dismiss, these "counts describe remedies, not claims for relief." (Br. Supp. 22.) Injunctive relief is an "ancillary remedy, not an independent cause of action." *Revelle v. Chamblee*, 168 N.C. App. 227, 230 (2005); *see also Window World of St. Louis, Inc. v. Window World of Bloomington, Inc.*, 2021 NCBC LEXIS 88, at \*\*15 (N.C. Super. Ct. Oct. 6, 2021) ("[I]njunctive relief is not a standalone claim[.]"). A request for an award of damages is similarly a remedy rather than a standalone claim. *See, e.g., Collier v. Bryant*, 216 N.C. App. 419, 434 (2011); *JCG & Assocs. LLC v.*

## A. **Breach of Contract**

19. Plaintiff's claim for breach of contract is premised on Downing's alleged breach of the Employment Agreement's non-solicitation and confidentiality provisions. Specifically, Plaintiff alleges Downing breached the Employment Agreement by: (i) "[s]oliciting or attempting to solicit [Exencial's] clients" following the termination of his employment with Exencial; (ii) "[s]haring Exencial's and Exencial's customer[s'] confidential information with unauthorized persons"; (iii) "[s]toring Exencial's and Exencial's customer[s'] confidential information on a personal, non-work laptop or computer"; (iv) "[s]ending Exencial's and Exencial's customer[s'] confidential information on a personal, non-work email"; and (v) "[s]haring Exencial's Confidential Information with his new employer."[28]

20. Under Oklahoma law, "[t]he elements of [a claim for breach of contract] are (1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach." *Cates v. Integris Health, Inc.*, 2018 OK 9, ¶ 11 (2018); *see also Digit. Design Grp., Inc. v. Info. Builders, Inc.*, 2001 OK 21, ¶ 33 (2001).

21. However, "a court will not enforce the illegal provisions of a contract." *Sholer v. State ex rel. Dep't of Pub. Safety*, 2006 OK CIV APP 145, ¶ 24 (2006). "When a *portion* of an agreement violates public policy and is unenforceable, the remainder is not always precluded from enforcement." *Hargrave v. Canadian Valley Elec.*

---

*Disaster Am. USA LLC*, 2022 NCBC LEXIS 156, at **24 (N.C. Super. Ct. Dec. 12, 2022) ("There is no standalone claim for punitive damages.").

[28] (Compl. ¶ 27.)

*Co-op., Inc.*, 1990 OK 43, ¶ 36 (1990). If the "unenforceable provision is not considered essential, the offending provisions will be excised and the remaining portions of the contract will be enforced." *Id.*[29]

**1) As drafted, the Employment Agreement's non-solicitation provisions are void and unenforceable as against Oklahoma's public policy, expressed through legislative mandate in 15 Okla. Stat. §§ 217 and 219A, and cannot serve as the basis for a breach of contract claim.**

22. Downing first argues that the non-solicitation provisions found in Section 5 of the Employment Agreement are contrary to Oklahoma's public policy concerning such provisions as memorialized in 15 Okla. Stat. §§ 217 and 219A.[30] Section 217 sets forth the general rule in Oklahoma that "[e]very contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219[31] of this title, or otherwise than as provided by Section 2 of this act, is to that extent void." 15 Okla. Stat. § 217. Section 219A provides an exception for certain solicitation restrictions:

> A. A person who makes an agreement with an employer, whether in writing or verbally, not to compete with the employer after the employment relationship has been terminated, **shall be permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer** as long as the former employee **does not directly solicit the sale of goods, services or a combination of**

---

[29] In addition, the Employment Agreement at issue contains a severability clause whereby "[e]ach of the provisions of this Agreement may be considered severable from the others." (Emp. Agmt. § 8.)

[30] (Br. Supp. 5–6.)

[31] 15 Okla. Stat. §§ 218 and 219 provide exceptions related to the sale of goodwill and the dissolution of a partnership, both of which are inapplicable here.

**goods and services from the *established* customers** of the former employer.

B. Any provision in a contract between an employer and an employee in conflict with the provisions of this section shall be void and unenforceable.

15 Okla. Stat. § 219A (emphasis added).

23. Downing contends that the customer solicitation restrictions set forth in Section 5 of the Employment Agreement go "well beyond the narrowly-defined exception set forth in 15 Okla. Stat. § 219A in several different ways" and are thus void and unenforceable.[32] Specifically, Downing argues:

(1) Section "5(c) bars Downing from soliciting 'prospective' customers [and] [a]s defined in [Section] 5(d)(ii), such persons cannot, as a factual matter, be 'established' customers of Exencial because they have never consummated a relationship with Exencial";[33]

---

[32] (Br. Supp. 9.)

[33] (Br. Supp. 9.) Section 5(c) of the Employment Agreement provides that, by signing the Employment Agreement, Downing:

[A]gree[d] that for a period of twenty-four (24) months subsequent to the termination of his…employment with [Exencial] (whether such termination occurs at the insistence of [Exencial] or the Employee)… Employee shall not for his…own account or for the account of any other Person…: solicit or attempt to solicit any Customer or Prospective Customer for the purpose of providing Competitive Services to such Customer.

"Prospective Customer" is defined in Section 5(d)(ii) as "those Persons known by Employee to have been solicited for business with any Competitive Service provided by [Exencial] within the twelve (12) month period preceding the date of Employee's termination from the Company."

(2) Section "5(d)(i) is void because it includes customers beyond those who are 'established' as defined by the Oklahoma Supreme Court in *Howard* [*v. Nitro-Lift Techs., L.L.C.*, 2011 OK 98, ¶ 26 (2011)] (holding 'established' customers are only 'those businesses and customers wherein a relationship was ongoing and anticipated to continue into the future.')";[34]

(3) The Employment Agreement "impermissibly bars 'indirect' solicitation";[35]

(4) "[B]y defining 'competitive services' to include 'potentially competitive' services, [Section] 5(d)(iii) purports to restrict Downing from soliciting customers to provide services Exencial did not offer during [his] employment but may choose to offer at some undefined time in the future";[36] and

(5) The "Contract bars Downing from initiating contact with any Exencial customer, for any reason—whether a solicitation or not."[37]

24. In addition, Downing contends Section 5(b) of the Employment Agreement[38], which purports to offer a "Purchase Option" should an Employee wish

---

[34] (Br. Supp. 10.) Section 5(d)(i) of the Employment Agreement defines "Customer" as "those Persons for whom [Exencial] is performing wealth-management services or rendering any other Competitive Service as of the date of Employee's termination from [Exencial]."

[35] (Br. Supp. 11; *see also* Emp. Agmt § 5(c) (barring former employees from "solicit[ing] or attempt[ing] to solicit any Customer or Prospective Customer" for a period of twenty-four months following termination).)

[36] (Br. Supp. 11.) Section 5(d)(iii) of the Employment Agreement states, "Competitive Services" means "any product, deliverable, or service competitive or potentially competitive with any product, deliverable, or service sold or provided or under development by [Exencial]."

[37] (Br. Supp. 11.)

[38] Section 5(b) provides:

to solicit Exencial's Customers or Prospective Customers following termination, is a "significant precondition that seeks to restrain Downing in his lawful business activity and is not contemplated by any exception to Oklahoma's general rule against non-competes."[39]

25. Plaintiff, in contrast, maintains that the Employment Agreement's non-solicitation provisions are valid and enforceable under Oklahoma law.[40]

26. The Court, applying Oklahoma law and following the precedent set by that state's courts, finds the Employment Agreement's non-solicitation provisions to be violative of Oklahoma public policy, void under Oklahoma law, and, therefore, unenforceable.

27. Oklahoma's state courts, including the Oklahoma Supreme Court, have instructed that "15 O.S. 2001 § 219A is the Legislature's pronouncement on Oklahoma's public policy regarding covenants not to compete." *Autry v. Acosta, Inc.*, 2018 OK CIV APP 8, ¶ 28 (2018) (referencing *Howard*, 2011 OK 98, ¶ 20). Although reversed by the United States Supreme Court on other grounds, "the Oklahoma Supreme Court's decision in *Howard* remains the best pronouncement of that Court's

---

Employee shall have the option to purchase the right ("Purchase Option") to provide unrestricted Competitive Services to such Customer or Prospective Customer of [Exencial] by compensating [Exencial] with payment of 250% of the Gross Revenue earned by [Exencial] from such Customer, or expected to be earned from such Prospective Customer, in [the] most recent twelve (12) months preceding the Employee's termination from [Exencial].

[39] (Br. Supp. 7.)

[40] (Pl.'s Mem. Opp'n Def.'s Mot. Dismiss [hereinafter, "Resp."] 6–18, ECF No. 25.)

instruction on the proper analysis of such non-solicitation agreements."[41] *Autry*, 2018 OK CIV APP 8, ¶ 28.

28. In *Howard*, the Oklahoma Supreme Court examined whether non-competition covenants contained in Defendant Nitro-Lift's employment agreement were enforceable under Oklahoma law. As an initial matter, the Oklahoma Supreme Court declined to analyze the "reasonableness" of the covenants "to protect the confidential information and technical knowledge imparted to the employees" as requested by the defendant.[42] *Howard*, 2011 OK 98, ¶ 18. Instead, the court held 15 Okla. Stat. § 219A is "the Legislature's pronouncement on Oklahoma's public policy regarding covenants not to compete" and, as "the language [of the statute] is plain and clearly expresses the legislative will, further inquiry is unnecessary." *Id.* at ¶ 19. The Oklahoma Supreme Court then interpreted the plain language of 15 Okla. Stat. § 219A:

> Subsection A [of 15 Okla. Stat. § 219A] utilizes the mandatory term, "shall," in association with the employee's right to engage in the same or similar business as that of the employer while subsection B [of 15 Okla. Stat. § 219A] provides that "any" provision in a contract between the employer and employee conflicting with those terms "shall be void and unenforceable." The term "any" is all-embracing and means nothing

---

[41] The United States Supreme Court reversed the Oklahoma Supreme Court's decision in *Howard* on grounds unrelated to the merits of the dispute, finding that it was for "the arbitrator to decide in the first instance whether the covenants not to compete are valid as a matter of applicable state law." *Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 22 (2012).

[42] Prior to *Howard*, in determining whether a restraint on competition was reasonable or enforceable with regards to 15 Okla. Stat. § 217, Oklahoma courts applied a rule of reason analysis wherein the court asked: "(1) what is the relevant market; (2) what is the effect of the restraint on competition in that market; and (3) if the effect is anticompetitive, are there any procompetitive benefits that outweigh the anticompetitive effects." *Inergy Propane, LLC v. Lundy*, 2009 OK CIV APP 8, ¶ 25 (2009).

less than "every" and "all." *The plain, clear, unmistakable, unambiguous, and unequivocal language of 15 O.S. 2001 § 219A prohibits employers from binding employees to agreements which bar their ability to find gainful employment in the same business or industry as that of the employer. The only exception allowed by the statutory provision is that the employee may be barred from soliciting goods or services from the employer's **established customers**.*

*Id.* at ¶ 21 (emphasis added and footnotes omitted). The *Howard* court clarified the meaning of "established customers," stating "[u]ndoubtedly, the Legislature, in utilizing the term 'established customer,' had in mind those businesses and customers wherein a relationship was ongoing and anticipated to continue into the future." *Id.* at ¶ 26.

29. The court then detailed the covenants at issue, taking into consideration their validity and enforceability under 15 Okla. Stat. §§ 217 and 219A:

The covenants not to compete contain provisions, for the period of two years, prohibiting the employees from accepting employment with any oil or gas entity located in the United States which generates five percent (5%) of its gross revenues from nitrogen generation. The same clause prevents the employees from: "owning, managing, operating, joining, controlling, or participating" in a similar business; being a director, officer, representative, partner, or consultant in any business engaging in nitrogen generation; loaning money to a like enterprise; or selling or leasing equipment to any person or business which has any significant portion of its business as nitrogen generation, whether or not the equipment is related to that particular portion of the business. The covenant conceivably could be interpreted to prevent the employees from taking jobs in any capacity from a competing business, even one not directly related to the nitrogen generation process. *The agreement not only bars active solicitation of current customers or suppliers of Nitro-Lift, it also forbids the employees from approaching past customers or suppliers. Furthermore, it operates to inhibit the employees from employing or engaging any Nitro-Lift officer or employee even where those individuals might seek employment on their own initiative rather than from any intervention by the employees.*

*Id.* at ¶ 22 (emphasis added). The non-competition contracts, the Oklahoma Supreme Court concluded, "go well beyond the bounds of what is allowable under §219A and violate the legislatively expressed public policy." *Id.* at ¶ 23. Thus, "the covenants not to compete are void and unenforceable as against Oklahoma's public policy expressed through legislative mandate." *Id.* at ¶ 23.

30. Curiously, Plaintiff failed to reference *Howard* in its response brief. In its response, Plaintiff, relying on the Oklahoma Court of Civil Appeals' pre-*Howard* holding in *Inergy Propane, LLC v. Lundy*, 2009 OK CIV APP 8, ¶ 28 (2009) and the U.S. District Court for the Northern District of Oklahoma's holding in *Helmerich & Payne Int'l Drilling Co. v. Schlumberger Tech. Corp.*, 2017 U.S. Dist. LEXIS 211447, at *17 n.8 (N.D. Okla. 2017), contends the Court should conduct a "rule of reason" analysis to determine whether the Employment Agreement's non-solicitation provisions are permissible reasonable restrictions on competition. Plaintiff argues that 15 Okla. Stat. § 219A "did not supplant the rule of reason analysis, but rather, it created an additional statutory exception to the general prohibition against contracts in restraint of trade set forth in § 217."[43] Under a rule of reason analysis, Plaintiff states, the Employment Agreement's non-solicitation clause and purchase option provision are enforceable.[44]

31. The Court declines to apply a rule of reason analysis to Plaintiff's breach of contract claims as Oklahoma's courts appear to have abandoned the rule of reason

---

[43] (Resp. 7 (citing *Inergy Propane, LLC*, 2009 OK CIV APP 8, ¶¶ 25, 28).)

[44] (Resp. 8–18.)

analysis in the context of non-solicitation and non-competition agreements since the *Howard* decision. In footnote 3 of *Howard*, the Oklahoma Supreme Court, referencing *Inergy Propane, LLC*, signaled it was moving away from the rule of reason analysis, emphasizing "[o]pinions released for publication by order of the Court of Civil Appeals are persuasive only and lack precedential effect." *Howard*, 2011 OK 98, ¶ 1 n.3. In *Inergy Propane, LLC*, the Court of Civil Appeals had determined that, at least in some instances, the rule of reason would be applicable even under the confines of 15 Okla. Stat. § 219A. *Inergy Propane, LLC*, 2009 OK CIV APP 8, ¶ 28.

32. Oklahoma's federal and state courts have recognized *Howard* as binding precedent. In *Autry*, the Court of Civil Appeals of Oklahoma concluded a non-solicitation agreement violated 15 Okla. Stat. § 219A because it prohibited more than the direct solicitation of established clients, as defined by the *Howard* court. The non-solicitation agreement, the court stated:

> prohibits Autry from soliciting "Clients" Autry represented while employed by Acosta. This includes past clients, for instance, companies with whom Acosta or Autry no longer had a business relationship when Autry left Acosta. Autry had worked for Acosta since 2008. The Non-Solicitation Agreement would prohibit Autry from directly "selling, soliciting, or promoting the sale of" clients of her current employer who were former clients of Acosta, even if they left Acosta years before Autry changed employers. . . .This Non-Solicitation Agreement would extend to previous business customers Autry had represented even though Acosta had no current relationship with them when Autry left and were past clients with whom Acosta did not have an ongoing relationship and those it could not reasonably anticipate continuing a business relationship in the future.

*Autry*, 2018 OK CIV APP 8, ¶ 32. Thus, the court found, "[e]xamined under the lens of § 219A, the Non-Solicitation Agreement is void and unenforceable as against

Oklahoma's public policy expressed by the Legislature's enactment of that section." *Id.* at ¶ 35.

33. Similarly, in *TruGreen Ltd. P'ship v. Okla. Landscape, Inc.*, 526 F. Supp. 3d 1080, 1094 (N.D. Okla. 2021), the U.S. District Court for the Northern District of Oklahoma, relying on *Howard* and *Autry*, found the non-solicitation provision in TruGreen's non-competition/non-solicitation agreements void and unenforceable under 15 Okla. Stat. § 219A. The TruGreen non-solicitation provision, the court held, violated 15 Okla. Stat. § 219A in several respects:

> First, it prohibits not only direct, but also *indirect* solicitation of or contact with an TruGreen customer . . . Second—and similarly—the term "contact in any manner" violates the statute because there are numerous ways in which permissible contact with TruGreen customers could occur . . . Third, the prohibition against "sell[ing] any product to TruGreen customers" directly violates Oklahoma's prohibition against non-competes . . . Finally, barring solicitation of any customer "with whom the employee had actual contact while employed by TruGreen" is impermissibly expansive, and would bar the Individual Defendants from contacting customers with whom they had contact but who may not be "established customers" of TruGreen.

*TruGreen Ltd. P'ship*, 526 F. Supp. 3d at 1094. As in *Howard* and *Autry*, the *TruGreen* court determined that Oklahoma's public policy concerning non-compete and non-solicitation agreements is set out in 15 Okla. Stat. §§ 217 and 219A and analyzed the provisions at issue in the context of the plain meaning of the statutes, rather than applying a rule of reason analysis.

34. Here, Exencial's non-solicitation provisions violate 15 Okla. Stat. §§ 217 and 219A in several respects. Section 5(c) prohibits not only direct, but also "attempted" solicitation of both Customers and Prospective Customers. Prospective Customers,

as defined in Section 5(d)(ii), cannot, as Defendant states, "be 'established' customers of Exencial because they have never consummated a relationship with Exencial."[45] Section 5(d)(i)'s definition of "Customer" similarly encompasses customers beyond those who have "a relationship [that is] ongoing and anticipated to continue into the future." *Howard*, 2011 OK 98, ¶ 26. The Purchase Option described in Section 5(b), which would require Defendant to compensate Exencial "with payment of 250% of the Gross Revenue earned by [Exencial] from such Customer, or expected to be earned from such Prospective Customer, in [the] most recent twelve (12) months preceding [Defendant's] termination," is likewise so burdensome that it fails to remedy Section 5(c)'s impermissible restrictions.

35.   As Section 5's non-solicitation provisions violate 15 Okla. Stat. §§ 217 and 219A by prohibiting far more than the "direct solicitation of established customers," this Court finds Section 5's non-solicitation provisions to be void and unenforceable. Because the Employment Agreement's non-solicitation provisions are void and unenforceable under Oklahoma law, the Court **GRANTS** Defendant's Motion to dismiss Plaintiff's claim for breach of contract to the extent it is based on Defendant's alleged breach of the Employment Agreement's non-solicitation provisions. The Court further determines that judicial modification of the Employment Agreement's non-solicitation provisions is inappropriate as these provisions would have to be substantially rewritten to cure multiple defects. *See Howard*, 2011 OK 98, ¶¶ 27–28

---

[45] (Br. Supp. 9.)

(stating the Oklahoma Supreme Court "will not reform a covenant not to compete so offensive that it would require [the court] to supply material terms").

**2) The Employment Agreement's confidentiality provisions are valid and enforceable as Oklahoma courts have not recognized the concept of a "de facto non-compete" and it is the Court's duty to apply, not create, Oklahoma law.**

36.     Downing next argues the Employment Agreement's confidential information restrictions operate as a de facto non-compete and, thus, are void.[46] Specifically, he states, Section 5(e), which provides that Downing has an "absolute obligation under this Agreement to not use the Company's Confidential Information or the Customer's Confidential Information for any purpose at any time after [Downing's] employment with [Exencial] ceases," is an unlawful restraint on legitimate business activity.[47]

37.     As an initial matter, Defendant has been unable to provide, and the Court has been unable to find, any precedent in which an Oklahoma court has recognized the concept of a de facto non-compete.  The Court, in applying Oklahoma law, is bound by the precedent set by Oklahoma courts.  The Court will decline Defendant's

---

[46] (Br. Supp. 13.)

[47] (Emp. Agmt. § 5(e); Br. Supp. 13.)  Section 1(a) of the Employment Agreement defines, in relevant part, "Company's Confidential Information" as:

> [A]ny information, knowledge, or know-how concerning the methods of operation of [Exencial]'s business that [sic] Employee may learn of or that otherwise becomes known to Employee during the time of Employee's employment with [Exencial] (whether or not [Exencial has] specifically designated that information as "confidential").

"Customer Confidential Information" is defined in Section 1(b) as "all non-public personal information (i.e., information that can be used to identify specific persons)[.]"

invitation to recognize the concept of a de facto non-compete because it would require this Court to create new law, rather than to interpret and apply existing Oklahoma law.

38. Even assuming arguendo that the concept of a de facto non-compete is consistent with existing Oklahoma law and would likely be recognized by Oklahoma's highest court, this Court finds the confidentiality provisions are not so burdensome that they operate as a de facto non-compete. Unlike the confidentiality provisions at issue in *Brown v. TSG Mgmt. Co., LLC*, 57 Cal. App. 5th 303 (2020), relied on by Defendant, the Employment Agreement's confidentiality restrictions do not so severely restrict Defendant's right to work that he is effectively barred "in perpetuity from doing any work in [his] field . . . [or] in his chosen profession." *Brown*, 57 Cal. App 5th at 319. "Company's Confidential Information," as defined in Section 1(a), rather than "refer[ring] to all aspects of working in the [wealth advising] industry at large," is limited to the "information, knowledge, or know-how concerning the methods of operation of the Company's business that [Defendant] may learn of or that otherwise becomes known to [him] during the time of [his] employment with the Company." *Brown*, 57 Cal. App 5th at 315. As Plaintiff states, the Employment Agreement expressly excludes from its definition of "Company's Confidential Information" information that is part of the public domain and "information that Employee can show came to Employee's attention before it was disclosed to Employee by the Company."[48] Similarly, the Employment Agreement's definition of "Customer

---

[48] (Resp. 17; Emp. Agmt. § 1(a).)

Confidential Information" does not effectively prohibit Downing from soliciting or doing business with Exencial's customers or prospective customers. Explicitly excluded from "Customer Confidential Information" is any information that is part of the public domain or can be discerned from publicly available information.[49] For the reasons stated above, this Court finds that the Employment Agreement's confidentiality provisions are enforceable.

**3) Plaintiff's allegations in the Complaint, taken as true and drawing all reasonable inferences in Plaintiff's favor, are sufficient to sustain a breach of contract claim as it relates to Downing's alleged violations of the Employment Agreement's confidentiality provisions at the motion to dismiss stage.**

39. Under Oklahoma law, the elements of a claim for breach of contract are: (1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach. *Cates*, 2018 OK 9, ¶ 11.

40. In the Complaint, Plaintiff alleges Downing breached the Employment Agreement's confidentiality provisions by: (i) "[s]haring Exencial's and Exencial's customer[s'] confidential information with unauthorized persons"; (ii) "[s]toring Exencial's and Exencial's customer[s'] confidential information on a personal, non-work laptop or computer"; (iii) "[s]ending Exencial's and Exencial's customer[s'] confidential information on a personal, non-work email"; and (iv) "[s]haring Exencial's Confidential Information with his new employer."[50]

---

[49] (Resp. 17; Emp. Agmt. § 1(b), (c).)

[50] (Compl. ¶ 27.)

41.    Taking Plaintiff's allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has alleged sufficient facts to support a breach of contract claim as it relates to Downing's breach of the Employment Agreement's confidentiality provisions.  In the Complaint, Plaintiff sufficiently pleads all required elements to support a *prima facie* case for breach of contract – the existence of a contract between the parties, how Defendant breached that contract, and what harm Plaintiff suffered as a result of Defendant's breach. Because Plaintiff has met this low burden, the Court **DENIES** Defendant's Motion as to Plaintiff's breach of contract claim to the extent it relates to Defendant's alleged breach of the Employment Agreement's confidentiality provisions.

## B.  Tortious Interference with Business Relationships

42.    Defendant next seeks the dismissal of Exencial's claim for tortious interference with business relationships, which Exencial pleads in the alternative to Breach of Contract.[51]   Exencial's claim for tortious interference with business relationships, as stated in the Complaint, is premised upon Downing "induc[ing] or attempt[ing] to induce Exencial's clients to terminate or breach their contract with Exencial."[52]

43.    "A claim for tortious interference with 'business relations' embraces claims for interference with both existing contracts and prospective future contracts." *E-Ntech Indep. Testing Servs. v. Air Masters, Inc.*, 2017 NCBC LEXIS 2, at *30 (N.C.

---

[51] (Compl. ¶ 31.)

[52] (Compl. ¶ 34.)

Super. Ct. Jan. 5, 2017) (citing *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2002 NCBC LEXIS 2, at \*29 (N.C. Super. Ct. July 10, 2002)).  Therefore, the Court will analyze Exencial's Tortious Interference with Business Relationships claim as one for both tortious interference with contract and tortious interference with prospective economic advantage.

44.     To state a claim for tortious interference with contract, a claimant must allege the following: (1) a valid contract exists between the claimant and a third person; (2) the opponent knows of the contract between claimant and the third party; (3) the opponent intentionally induces the third person not to perform the contract with claimant; (4) the opponent in doing so acts without justification; and (5) the interference results in actual damage to claimant. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988) (citing *Childress v. Abeles*, 240 N.C. 667, 674 (1954)).

45.     The difference between a tortious interference with contract claim and a tortious interference with prospective economic advantage claim lies in the timing of the interference.  *Lunsford v. Viaone Servs., LLC*, 2020 NCBC LEXIS 111, at \*13 (N.C. Super. Ct. Sept. 28, 2020).  While a tortious interference with contract claim exists when the interference occurs after the contract is formed, a tortious interference with prospective economic advantage claim arises when someone "induces a third party 'not to enter a contract with' the [claimant] when the contract would have resulted 'but for the interference.'" *Id.* (quoting *Dalton v. Camp*, 353 N.C. 647, 654 (2001) (internal citations omitted)).  "In either case, the interference is actionable only if done 'without justification.'" *Id.* (quoting *United Labs., Inc.*, 322

N.C. at 661). Interference is deemed to be without justification if the defendant's motives were not reasonably related to the protection of a legitimate business interest of the defendant. *See, e.g., Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605 (2007); *K&M Collision, LLC v. N.C. Farm Bureau Mut. Ins. Co.*, 2017 NCBC LEXIS, at *20–21 (N.C. Super. Ct. Nov. 21, 2017).

46. Downing argues that the Complaint "tacitly concedes that Downing's alleged interference was justified as a matter of law" and, thus, Exencial's tortious interference claim must fail.[53] More specifically, Downing states, "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interest and by means that are lawful."[54] As Exencial and Cary Street Partners are competitors in the financial services industry, Downing contends his alleged interference with Exencial's business relationships is justified and Exencial fails to adequately plead a necessary element of its claim.[55]

47. In addition, Downing contends, to support a claim of tortious interference and adequately plead lack of justification, the Complaint must "admit of no motive for interference other than malice."[56] Here, Downing states, Exencial "fails to plead malice sufficient to overcome Downing's legal justification" as "Exencial alleges

---

[53] (Br. Supp. 17.)

[54] (Br. Supp. 17 (quoting *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221 (1988)).)

[55] (Br. Supp. 17–18.)

[56] (Br. Supp. 18.)

'malice' in conclusory fashion . . . [and] [s]uch 'general allegations of malice are insufficient as a matter of pleading.'"[57]

48. Lastly, Downing argues, Exencial's tortious interference claim must fail because Exencial's claim "depends on a finding that Downing has breached *enforceable* restrictions on competition or use of information that constitutes a trade secret" and Exencial "cannot [show this] as a matter of law."[58]

49. The Court, as an initial matter, agrees with Defendant that Exencial's claim depends on a finding that Defendant has breached enforceable restrictions on competition or has competed with Exencial by means that were unlawful. To support a claim for tortious interference with business relationships, a plaintiff must allege that the defendant acted without justification. Competition in business, so long as it is carried on in furtherance of one's own interest and by means that are *lawful*, constitutes justifiable interference in another's business relationships. *See Peoples Sec. Life Ins. Co.*, 322 N.C. at 221.

50. Here, the Court finds that Exencial has adequately pleaded that Defendant engaged in unlawful competition by (1) "remov[ing] Exencial owned and developed Confidential Information and sen[ding] it to his personal, non-work email, and stor[ing] Confidential Information on his personal laptop or computer"[59] and (2)

---

[57] (Br. Supp. 18–19.)

[58] (Reply Supp. Def. Jacob Downing's Mot. Dismiss [hereinafter, "Reply"] 12–13, ECF No. 26.)

[59] (Compl. ¶ 19.)

"using Exencial's confidential information and soliciting Exencial's clients"[60] in breach of enforceable restrictions on the use of confidential information. Because Exencial has adequately pleaded all elements needed to support a *prima facie* case of tortious interference with business relationships – the existence of a valid contract between Exencial and a third person, that Downing knew of the contract, that Downing intentionally induced the third person not to perform the contract, that Downing acted without justification, and damages – Defendant's Motion seeking to dismiss Plaintiff's tortious interference with business relationships claim shall therefore be **DENIED**.

### C. Misappropriation of Trade Secrets

51.    Defendant next seeks the dismissal of Exencial's claim for misappropriation of trade secrets.

52.    Under the Trade Secrets Protection Act (the "TSPA"), "[t]he owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret." N.C.G.S. § 66-153.  For purposes of the TSPA, a "trade secret" is defined as "business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that" both:

    a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

    b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  N.C.G.S. § 66-152(3).

---

[60] (Compl. ¶ 17.)

53. North Carolina employs six factors when determining the existence of a trade secret: (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others. *Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81 (1997); *see also M.D. Claims Grp., LLC v. Bagley*, 2025 NCBC 2, at *51 (N.C. Super. Ct. Jan. 22, 2025).

54. To plead misappropriation of trade secrets, "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468 (2003); *see also Krawiec v. Manly*, 370 N.C. 602, 609–10 (2018). "[A] complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is 'insufficient to state a claim for misappropriation of trade secrets.'" *Washburn v. Yadkin Valley Bank & Trust Co.*, 190 N.C. App. 315, 327 (2008) (quoting *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 511 (2004)).

55. The TSPA defines "misappropriation" as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless

such trade secret was arrived at by independent, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1). Just as a trade secret must be identified with "sufficient particularity," "conclusory allegations of misappropriation are insufficient." *M.D. Claims Grp., LLC*, 2025 NCBC at *53; *see also States Mortg. Co. v. Bond*, 2023 NCBC LEXIS 33, at **12 (N.C. Super. Ct. Mar. 6, 2023).

56. Downing argues that Exencial's claim for misappropriation of trade secrets must be dismissed because the Complaint fails to identify any alleged trade secret with sufficient specificity.[61] The Complaint describes the allegedly misappropriated trade secrets as Exencial's "Confidential Information, manner of doing business with customers, Exencial's members' contact information, and other non-public information."[62] Such "vague and conclusory pleadings," Downing contends, are insufficient as a matter of law and cannot withstand a Rule 12(b)(6) motion.[63]

57. Furthermore, Downing argues, Exencial fails "adequately to allege 'the acts by which the misappropriation was accomplished.'"[64] Rather than alleging misappropriation with "sufficient particularity," Exencial's Complaint contains only "threadbare allegations."[65]

---

[61] (Br. Supp. 19.)

[62] (Compl. ¶ 39; *see also* Br. Supp. 19.)

[63] (Br. Supp. 19–20.)

[64] (Br. Supp. 20.)

[65] (Br. Supp. 21.)

58. The Court agrees. In its Complaint, Exencial does little more than recite the general elements of a misappropriation of trade secrets claim, never identifying with "sufficient particularity" the claim's key element – the existence of a trade secret. As earlier stated, in its Complaint, Exencial identifies "its Confidential Information, manner of doing business with customers, Exencial's members' contact information, and other non-public information" as potential trade secrets.[66] Exencial's Confidential Information, as defined in the Employment Agreement, "may include, among other things, customer lists, sales information, price lists, operational, sales, promotional, marketing, and administrative methods, procedures and techniques."[67] This broad, all-encompassing definition falls far short of "enabl[ing] a defendant to delineate that which he is accused of misappropriating." *Analog Devices, Inc.*, 157 N.C. App. at 468. Similarly, "non-public information," a phrase left undefined by the Employment Agreement, is insufficiently particular to identify for Defendant what he is accused of misappropriating.

59. While North Carolina courts have previously found "business methods" to constitute trade secrets, they have done so only when the business methods are identified with sufficient particularity. *Compare Cty. of Wake PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at *24 (N.C. Super. Ct. Sep. 9, 2020) (finding SEM Strategies along with AdWords to be a business method which could constitute a potential trade secret)*; with Washburn*, 190 N.C. App. at 327 (finding an

---

[66] (Compl. ¶ 39.)

[67] (Emp. Agmt. § 1(a).)

allegation that "business methods; clients, their specific requirements and needs . . . other confidential information pertaining to [plaintiff's] business . . . confidential client information and confidential business information" constituted trade secrets to be too broad and vague). Here, as in *Washburn*, Exencial simply alleges that its "manner of doing business with customers" constitutes a trade secret without providing further detail; nowhere in the Complaint does Exencial elaborate on what constitutes Exencial's specific "manner of doing business."

60. Similarly, though a "compilation of information," such as customer contact information, has been found to rise to the level of a trade secret under North Carolina law, sufficient detail must be provided in the complaint to put Defendant "on notice as to the precise information allegedly misappropriated." *Krawiec*, 370 N.C. at 611 (concluding that identification of trade secrets as "original ideas and concepts for dance productions, marketing strategies and tactics, as well as student, client and customer lists and their contact information" was insufficiently particular); *see also Design Gaps, Inc. v. Hall*, 2024 NCBC LEXIS 64, at *19 (N.C. Super. Ct. May 1, 2024) (finding identification of trade secrets as "customer lists, pricing formulas, and bidding formulas" to be insufficient to support a claim for misappropriation of trade secrets); *compare with CRH E., LLC v. Berastain*, 2025 NCBC LEXIS 11, at *P60 (N.C. Super. Ct. February 4, 2025) (finding "lists of customers, along with detailed information about each [customer] such as contact information, preferences and requirements for the work performed for them, terms of the contracts with these customers, pricing and discounts offered to these customers, and other information

that enables CTS Metrolina to provide the right services at the right prices to these customers" to sufficiently allege the existence of a trade secret). Here, Exencial has identified "Exencial's members' contact information" as a trade secret without providing further detail about this customer information. This description is too broad and vague to enable the Defendant to delineate what he is accused of misappropriating.

61. For the reasons described above, the Court concludes that Exencial has failed to plead the existence of a trade secret with sufficient particularity and thereby **GRANTS** Defendant's Motion to dismiss the claim for misappropriation of trade secrets.

### D. Declaratory Judgment

62. Defendant lastly seeks the dismissal of Plaintiff's claim for a declaratory judgment that "Defendant has an obligation to refrain from using or sharing Plaintiff's Confidential Information."[68] Though Defendant claims Count D of Plaintiff's Complaint, Declaratory Judgment, is a "remed[y], not [a] claim[] for relief[,]"[69] seeking a declaratory judgment is recognized as an independent cause of action under North Carolina law. Further, neither Plaintiff nor Defendant directly addresses Plaintiff's claim for declaratory judgement in their briefing.

63. Under the Declaratory Judgment Act, "[a]ny person interested under a . . . written contract . . . , or whose rights, status or other legal relations are affected

---

[68] (Compl. ¶ 51.)

[69] (Br. Supp 22.)

by a . . . contract . . . , may have determined any question of construction or validity arising under the . . . contract . . . , and obtain a declaration of rights, status, or other legal relations thereunder." N.C.G.S. § 1-254. When asserting a claim for declaratory judgment, the claimant "must set forth in his pleading all facts necessary to disclose the existence of an actual controversy between the parties . . . with regard to their respective rights and duties." *Lide v. Mears*, 231 N.C. 111, 118 (1949). A motion to dismiss pursuant to Rule 12(b)(6) is "seldom an appropriate pleading in actions for declaratory judgments, and . . . is allowed only when the record clearly shows that there is no basis for declaratory relief as when the complaint does not allege an actual, genuine existing controversy." *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 439 (1974). However, a court may dismiss a claim for declaratory judgment as duplicative if "all . . . issues concern questions that the Court will have to resolve in addressing the parties' . . . claims for breach of contract[.]" *Innovare, Ltd. V. Sciteck® Diagnostics, Inc.*, 2023 NCBC LEXIS 8, at *70 (N.C. Super. Ct. Jan. 19, 2023); *see also Stein ex rel. Dogwood Health Tr. v. MH Master Holdings, LLLP*, 2024 NCBC LEXIS 152, at *37 (N.C. Super. Ct. Dec. 6, 2024) (holding the court has discretion to deny declaratory relief that serves no useful purpose or is duplicative of pending claims).

64. Here, Plaintiff seeks a declaratory judgment that the confidentiality provisions of the Employment Agreement oblige Defendant to refrain from using or sharing Plaintiff's Confidential Information. Whether the Employment Agreement's confidentiality provisions are valid and enforceable and, thus, whether Defendant

has an obligation to refrain from using or sharing Plaintiff's Confidential Information, must necessarily be resolved in the Court's determination of Plaintiff's breach of contract claims. Accordingly, the Court **GRANTS** Defendant's Motion to dismiss Plaintiff's claim for declaratory judgment as this claim is duplicative of Plaintiff's breach of contract claim with respect to the Employment Agreement's confidentiality provisions.

V.

CONCLUSION

65. **WHEREFORE**, for the reasons set forth above, the Court hereby **GRANTS in part** and **DENIES in part** the Motion as follows:

a. Defendant's Motion is **GRANTED** with respect to Plaintiff's breach of contract claims based on Downing's alleged breach of the Employment Agreement's non-solicitation provisions, and Plaintiff's claims are hereby **DISMISSED with prejudice** to this extent.

b. Defendant's Motion is **DENIED** as to Plaintiff's breach of contract claims based on Downing's alleged breach of the Employment Agreement's confidentiality provisions.

c. Defendant's Motion is **DENIED** as to Plaintiff's claim for tortious interference with business relationships.

d. Defendant's Motion is **GRANTED** with respect to Plaintiff's claim for misappropriation of trade secrets, and Plaintiff's claim is hereby **DISMISSED without prejudice**.

e.  Defendant's Motion is **GRANTED** as to Plaintiff's claim for declaratory judgment that Defendant has an obligation to refrain from using or sharing Plaintiff's Confidential Information, and Plaintiff's claim is hereby **DISMISSED with prejudice**.

f.  Defendant's Motion is otherwise **DENIED**.

**SO ORDERED**, this the 1st day of April, 2025.

/s/ A. Todd Brown
A. Todd Brown
Special Superior Court Judge
 for Complex Business Cases