An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-419

Filed 1 October 2025

Halifax County, No. 22CVS000337-410

CITY OF ROANOKE RAPIDS, Plaintiff,

v.

HALIFAX COUNTY, Defendant.

Appeal by plaintiff from order and judgment entered 19 January 2023 by Judge Jeffery B. Foster in Halifax County Superior Court. Heard in the Court of Appeals 18 October 2023.

*Chichester Law Office, by Geoffrey P. Davis, for plaintiff-appellant.*

*Halifax County Attorney M. Glynn Rollins, Jr., for defendant-appellee.*

GORE, Judge.

The core dispute between the City of Roanoke Rapids ("plaintiff") and Halifax County ("defendant") concerns which entity bears financial responsibility for the operation of the Halifax County Central Communications Center public safety answering point ("PSAP"). Plaintiff brought this action under the Uniform Declaratory Judgment Act, N.C.G.S. § 1-253 *et seq.*, seeking a declaration of the parties' respective obligations regarding municipal emergency dispatch services

under "relevant" North Carolina law. Plaintiff now appeals from the trial court's order denying its request for declaratory relief and granting such relief in favor of defendant.

The trial court's 19 January 2023 order on summary judgment is a final judgment resolving all claims. This Court has jurisdiction pursuant to N.C.G.S. § 7A-27(b). Upon review, we affirm in part and reverse in part.

**I.**

Defendant operates Halifax County's sole PSAP, which provides enhanced 911 call-taking services under N.C.G.S. § 143B-1400. It receives limited funding from the N.C. 911 Board, subject to strict use restrictions under § 143B-1406(d).

Over time, defendant and Halifax County municipalities, including plaintiff, have entered interlocal agreements on local PSAP funding. Municipalities do not pay for expenses covered by N.C. 911 Board funds. The last agreement plaintiff joined was a 2013 amendment to a 2004 agreement, under which plaintiff agreed to reimburse a portion of defendant's PSAP costs based on two variables: the PSAP's annual budget and plaintiff's share of total call volume.

On 29 June 2020, plaintiff gave 12 months' notice that it would end financial support for the Halifax County Central Communications Center effective 1 July 2022 (FY 2022–23). No interlocal funding agreement currently exists between the parties for that fiscal year. In 2021, defendant entered a new agreement with all other Halifax County municipalities, under which each funds PSAP personnel based on its

share of call volume. Defendant continues to provide call-taking services for plaintiff's public safety agencies.

The core of this dispute is plaintiff's claim that, since 2010, changes in North Carolina law require defendant—as Halifax County's sole PSAP operator—to provide services to plaintiff's public safety agencies regardless of plaintiff's financial support. On 3 May 2022, plaintiff filed suit seeking a declaratory judgment to that effect and injunctive relief preventing defendant from ceasing emergency call and dispatch services.

By counterclaim, defendant sought a declaratory judgment that all municipalities needing 911 call-taking services—including plaintiff—must share in costs not covered by N.C. 911 Board funds. While conceding its duty to provide such services, defendant argued it lacks statutory or constitutional authority to absorb plaintiff's share of municipal police and fire service costs.

The parties filed cross-motions for summary judgment. The trial court ruled for defendant, holding that PSAP operating costs "cannot be imposed exclusively on the PSAP provider," as doing so would exceed its constitutional and statutory taxing authority by funding services for other local governments. The court further ordered that, absent an interlocal agreement, each PSAP user must contribute to the provider's annual personnel costs based on its share of total call volume. Plaintiff's share would be calculated using actual, not budgeted, personnel costs.

**II.**

In its 19 January 2023 order, the trial court denied plaintiff's motion and granted defendant summary judgment on its counterclaim for declaratory relief. "North Carolina courts have held that summary judgment is an appropriate procedure in an action for declaratory judgment." *Medearis v. Trs. of Meyers Park Baptist Church*, 148 N.C. App. 1, 4 (2001) (citations omitted). "Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *In re Will of Jones*, 362 N.C. 569, 573 (2008) (cleaned up); *see also* N.C.G.S. § 1A-1, Rule 56(c) (2022). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." *Dalton v. Camp*, 353 N.C. 647, 651 (2001). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337 (2009) (cleaned up).

On appeal, plaintiff challenges two of the trial court's legal conclusions as lacking support in applicable law. The trial court did list several findings of fact and conclusions of law in its Order, but the trial court "is not required to make finding[s] of fact and conclusions of law in determining a motion for summary judgment, and if [it] does make some, they are disregarded on appeal." *Mosley v. Nat'l Fin. Co.*, 36 N.C. App. 109, 111 (1978) *overruled in part on other grounds as stated in Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 280 (1987). "Nevertheless, it may be helpful in

some cases for the trial court to summarize the undisputed facts which justify its order." *Cieszko v. Clark*, 92 N.C. App. 290, 293 (1988). Thus, appellate review is not constrained to those specific conclusions of law that plaintiff challenges.

**A.**

We begin by addressing whether the parties had standing to bring their respective claims under the Uniform Declaratory Judgment Act ("UDJA"). Under the UDJA, "[c]ourts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed." N.C.G.S. § 1-253 (2022). "Any person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." § 1-254 (2022). "The purpose of the [UDJA] . . . is to settle and afford relief from uncertainty concerning rights, status and other legal relations, and although the Act is to be liberally construed, its provisions are not without limitation." *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 446 (1974) (citation omitted). It is well-established that "the apparent broad terms of the statute do not confer upon the court an unlimited jurisdiction of a merely advisory nature to construe and declare the law." *Tryon v. Duke Power Co.*, 222 N.C. 200, 203 (1942).

Although neither party raised standing on appeal, it may be addressed for the first time, including *sua sponte*. *Aubin v. Susi*, 149 N.C. App. 320, 324 (2002). The

trial court did not rule on standing, but we review the issue de novo and do not rely on its findings. *Mosley*, 36 N.C. App. at 111. Summary judgment is affirmed if correct on any ground, regardless of the trial court's reasoning. *Shore v. Brown*, 324 N.C. 427, 428 (1989). Whether a plaintiff has standing is reviewed de novo. *Thomas v. Thomas*, 280 N.C. App. 526, 531 (2021).

"Standing refers to whether a party has a sufficient stake in an otherwise justiciable controversy such that he or she may properly seek adjudication of the matter. Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Am. Woodland Indus. v. Tolson*, 155 N.C. App. 624, 626–27 (2002) (quotation marks and citations omitted). Plaintiff, as the party that initiated this action, has "the burden of proving that standing exists." *Id.* at 627 (citation omitted).

The question of standing to seek declaratory relief is often complex. Fortunately, our Supreme Court's recent decision in *United Daughters of the Confederacy v. City of Winston-Salem*, 383 N.C. 612 (2022), is dispositive. While we encourage the parties to review that case in full, we highlight key portions relevant to our analysis below. Consistent with *United Daughters*, both plaintiff and defendant have failed to establish standing to pursue declaratory relief. Thus, the trial court properly denied plaintiff's motion for summary judgment but erred in granting summary judgment in favor of defendant.

*1.*

In *United Daughters of the Confederacy*, the plaintiff challenged the City's decision to remove a Confederate monument from the grounds of the former Forsyth County Courthouse. 383 N.C. at 614. The amended complaint sought a declaratory judgment regarding the parties' respective rights and a preliminary injunction to prevent the monument's relocation. *Id.* at 619. The defendants moved to dismiss for lack of subject matter jurisdiction, arguing the plaintiff lacked standing. The trial court agreed, finding the plaintiff had not established standing, lacked subject matter jurisdiction, and failed to state a claim, and dismissed the complaint with prejudice. *Id.* at 620.

On appeal, a divided panel of this Court affirmed, with the majority agreeing that the plaintiff lacked standing and that dismissal with prejudice was proper. *Id.* at 620–21. The dissent, however, would have found standing, citing factual disputes over monument ownership and concluding that sole ownership was not required to pursue declaratory relief. *Id.* at 621–22. The dissent emphasized that the amended complaint alleged an actual controversy sufficient to support standing. *Id.* at 622. Plaintiff appealed to the Supreme Court based on the dissent. *Id.* at 624.

**2.**

The Supreme Court addressed whether the plaintiff's amended complaint sufficiently established standing to challenge the City's action. *Id.* at 614–15. The Court affirmed in part, holding that the plaintiff lacked standing, but reversed in part, determining that the trial court erred by dismissing the complaint with

prejudice. *Id.* at 615. In reaching its decision—and as especially relevant here—the Court began by outlining North Carolina's standing requirements for declaratory judgment actions, stating:

> A plaintiff must establish standing in order to assert a claim for relief. As a general matter, the North Carolina Constitution confers standing on those who suffer harm. As we have previously explained, the gist of the question of standing is whether the party seeking relief has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions. Prior to our decision in *Committee to Elect Dan Forest v. Employee Political Action Committee*, 376 N.C. 558 [(2021]), . . . the Court of Appeals had consistently held that North Carolina's standing requirements were identical to those enforced in the federal courts . . . . In *Committee to Elect Dan Forest*, however, we held that, . . . .when a person alleges the infringement of a legal right directly under a cause of action at common law, a statute, or the North Carolina Constitution . . . the legal injury itself gives rise to standing.

*Id.* at 625–26 (cleaned up).

The Court then addressed the plaintiff's standing arguments, noting that the plaintiff had, at times, conflated standing with the separate issue of whether the City's actions were lawful under the cited state and federal laws. *Id.* at 626. The Court continued its discussion, stating, as is relevant to this case:

> As an initial matter, [the] plaintiff argues that, to challenge a statute, municipal ordinance, policy, or action, a plaintiff need only demonstrate that it has been injuriously affected by the enactment or policy or action. . .

> . In [the] plaintiff's view, although a declaratory judgment action must involve an actual controversy between the parties, plaintiffs are not required to allege or prove that a traditional cause of action exists against defendants in order to establish an actual controversy. . . .
>
> . . . .
>
> Finally, [the] plaintiff claims that it "did not start this fight" and that it had, instead, been "clearly and specifically threatened with adverse consequences by the City of Winston-Salem if it failed or refused to remove the monument." According to [the] plaintiff, "to deny that it does not have the right to defend itself in a court of law when it was the recipient of a clear and unequivocal attack would be to subvert accepted and well-established concepts of due process and equal protection under law." . . . As a result, plaintiff contends that "this action squarely raises the question of the ownership of the monument," and that "it is only logical to find that standing exists if an individual or entity is alleged to own an item of property as has been the case with allegations made concerning [the] [p]laintiff and its alleged ownership of the monument."

*Id.* at 627–29 (cleaned up).

The Court responded to the plaintiff's assertions, as is particularly relevant in this case, stating:

> [The] [p]laintiff's arguments rest upon a fundamental misunderstanding of the law of standing. In essence, [the] plaintiff appears to believe that by simply filing a declaratory action and asserting that there was an "actual controversy between the parties" relating to the identity of the monument's owner, it has made a sufficient showing to establish standing. However, as the majority of the Court of Appeals observed, *the mere filing of a declaratory judgment is not sufficient*, on its own, to grant a plaintiff standing, with it being necessary for a party to establish standing *as a prerequisite* for the assertion of a declaratory

judgment claim. In other words, [the] plaintiff is still required to demonstrate that it has sustained *a legal or factual injury arising from defendants' actions* as *a prerequisite for maintaining the present declaratory judgment action*.

. . . .

A careful analysis of the amended complaint satisfies us that [the] plaintiff has failed to identify any legal right conferred by the common law, state or federal statute, or the state or federal constitutions of which they have been deprived by [the] defendants' conduct. . . . A number of [the] plaintiff's other allegations, including its assertion that the City's actions "infringed upon the freedom of speech of the plaintiff and the citizens of the County, that these actions "violated the right of equal protection pursuant to the Fourteenth Amendment," and that [the] "plaintiff will be irreparably harmed if [the] defendants take affirmative action to remove or relocate the monument prior to a full adjudication of the respective rights and obligations of the parties," are nothing more than conclusory statements devoid of any factual or legal support.

. . . .

[E]ven construing [the] plaintiff's allegations concerning the funding for and erection of the monument as true, the mere fact that the local chapter "funded and erected the monument" does not suffice to establish standing in the absence of an affirmative claim to have some sort of proprietary or contractual interest in the monument. This is particularly true given that the plaintiff's allegations that the City's actions violated various state and federal laws, which we address in further detail below, assume that the County, rather than plaintiff, owns the monument.

. . . .

Finally, [the] plaintiff's assertion that it has standing because it "has the right to defend itself in a court of law

when it was the recipient of a clear and unequivocal attack" finds no support in the law or the facts of this case. Neither the allegations contained in the amended complaint nor the evidence contained in the record support [the] plaintiff's contention that it was "*clearly and specifically threatened with adverse consequences* by the City of Winston-Salem if it failed or refused to remove the monument." Instead, the amended complaint simply alleges that the City had "*caused a letter to be sent* to [the] plaintiff stating that it had until [31 January] 2019 to remove the monument. The letter itself, a copy of which appears in the record on appeal and the authenticity of which has not been questioned by any party, acknowledges that "claims of ownership of the monument have come from the United Daughters of the Confederacy," directs plaintiff "to remove and relocate" the monument by 31 January 2019, and *warns* that "failure to comply with this directive *may result* in the City seeking a court order for the removal and relocation of the monument to preserve the same and to address public safety concerns." Although the letter does suggest that the City intended to utilize some sort of judicial process to facilitate the monument's removal in the event that [the] plaintiff failed to remove it voluntarily, neither the letter nor the amended complaint contains *any threat* that the City *intended to institute legal action* directly against [the] plaintiff.

In addition, even if one takes the allegations contained in the amended complaint as true, *the mere fact that the City sent [the] plaintiff a letter* in which it set a deadline for the removal of the monument *does not automatically confer standing* upon [the] plaintiff, particularly given the absence of any allegation that [the] plaintiff has any proprietary or contractual interest in the monument. As the trial court correctly observed, [the] plaintiff, as the party that initiated the lawsuit, has the burden of proving that standing exists. Thus, for all these reasons, we hold that the amended complaint even "when liberally construed," *fails to allege the infringement of a legal right directly under a cause of action at common law, a statute, or the North Carolina Constitution* sufficient to give

plaintiff standing to challenge the City's actions in removing the monument from the old courthouse property.

*Id.* at 627–33 (emphasis added) (cleaned up).

The Court next considered the plaintiff's claim that the City violated various state laws by relocating the monument. *Id.* at 634. While much of that discussion is not directly relevant here, certain portions are instructive, as plaintiff in this case appears to argue—implicitly—that defendant violated N.C.G.S. § 143B-1400(7), or that the 2010 amendment to that statute supports its requested relief. The Court stated as follows:

> As an initial matter, [the] plaintiff argues that the City "denied plaintiff due process of law and violated N.C.G.S. § 100-2.1" by removing the monument from the old courthouse property. . . . According to [the] plaintiff, "[its] . . . allegations are patently sufficient to invoke the provisions of N.C.G.S. § 100-2.1 as a basis for adjudicating the rights and responsibilities of the respective parties to this dispute."
>
> . . . .
>
> We are not persuaded by any of [the] plaintiff's arguments. As an initial matter, [the] plaintiff has completely failed to explain how the City's actions "denied plaintiff due process of law." In order to establish a due process violation, a plaintiff must identify a cognizable legal right of which it was allegedly deprived by the City's actions. Even if N.C.G.S. § 100-2.1 applies in the set of circumstances that is before us in this case, we are unable to conclude that it confers any legal rights upon [the] plaintiff sufficient to give rise to any sort of due process claim or other valid legal claim.
>
> A statute may authorize a private right of action either

explicitly or implicitly, though typically, a statute allows for a private cause of action only where the legislature has expressly provided a private cause of action within the statute. As a result, in the event that the legislature exercises its power to create a cause of action under a statute, the plaintiff has standing to vindicate the legal right *so long as he is in the class of persons on whom the statute confers a cause of action.* Although this Court has not addressed the circumstances in which a statute *implicitly* authorizes a private cause of action, the Court of Appeals has concluded that an implicit right of a cause of action exists when a statute requires action from a party, and that party has failed to comply with the statutory mandate.

We are unable to identify anything in N.C.G.S. § 100-2.1, particularly when read in conjunction with the allegations of the amended complaint, that explicitly authorizes the assertion of a private cause of action for the purpose of enforcing that statutory provision. The absence of explicit language authorizing the assertion of a private right of action based on N.C.G.S. § 100-2.1 stands in stark contrast to the statute at issue in *Committee to Elect Dan Forest*, which specifically authorized a candidate for elected office who had complied with the relevant campaign finance laws to sue an opposing candidate or candidate committee for an alleged violation of those same laws. In addition, even assuming, without deciding, that the Court of Appeals has correctly identified the circumstances under which a statute implicitly authorizes a private right of action in *Sugar Creek Charter School*, nothing in N.C.G.S. § 100-2.1 requires action from a party with which that party has failed to comply. Instead, N.C.G.S. § 100-2.1 *prohibits* the removal or relocation of certain specified objects that are owned by the State or located on public property. Finally, even if N.C.G.S. § 100-2.1 could be interpreted to implicitly authorize the assertion of a private right of action, nothing in the relevant statutory language or the allegations contained in the amended complaint suggests that plaintiff would be in the class of persons on which the statute confers the right.

> In addition, we further conclude that, even if plaintiff is entitled to assert a private right of action to enforce N.C.G.S. § 100-2.1, that statutory provision has no application to the facts that are before us in this case in light of the allegations contained in the amended complaint. . . .

*Id.* at 634–38 (cleaned up).

The Court concluded its discussion, holding:

> [W]e reaffirm our longstanding rule that a plaintiff must establish standing to bring an action pursuant to the Declaratory Judgment Act. As this Court held long ago, the Declaratory Judgment Act does not license litigants to fish in judicial ponds for legal advice. For the reasons set forth above, we hold that the trial court did not err by dismissing the amended complaint for lack of standing.

*Id.* at 651 (quotation marks and citations omitted). The Court also reversed in part, holding that the trial court erred by dismissing the complaint with, rather than without, prejudice. *Id.* Unlike *United Daughters of the Confederacy*, however, this case arises from a summary judgment order under Rule 56(c), not a Rule 12(b)(1) dismissal for lack of subject matter jurisdiction. *Id.* at 624. A summary judgment has res judicata effect, whereas a Rule 12(b)(1) dismissal for lack of subject matter jurisdiction does not, as it is not a decision on the merits. Under North Carolina precedent, summary judgment is proper where the plaintiff lacks standing. *Edwards v. Town of Louisburg*, 892 S.E.2d 76, 81 (N.C. Ct. App. 2023).

**B.**

*1.*

- 14 -

Turning to the present case, plaintiff's verified complaint includes the following relevant allegations:

29. At this point, there is an actual controversy between the parties with respect to their rights, obligations, and duties under relevant North Carolina law, and absent an order of this [c]ourt, will controversy remain unresolved.

## FIRST CAUSE OF ACTION

### Declaratory Judgment

30. Plaintiff reincorporates the allegations of the preceding paragraphs as if set forth fully herein.

31. That under Chapter 143B of the North Carolina General Statutes and the portions of the North Carolina Administrative Code enacted pursuant to the authority vested in the State 911 Board, [d]efendant, as the operator of [the] county's sole and primary PSAP under [N.C.G.S.] § 143B-1400, is required by North Carolina law to provide dispatching services to [p]laintiff and [p]laintiff's public safety agencies at no charge.

32. That upon information and belief, should [p]laintiff fail to agree to the terms of [d]efendant's Proposed Agreement, [d]efendant will invoice [p]laintiff for an amount of costs to be determined by [d]efendant, and will likely take steps to recover it.

33. Therefore, litigation between the parties over the costs of municipal dispatching and their obligations under the relevant laws of the State of North Carolina is inevitable and unavoidable.

34. As such, the disagreement between the parties as described in this Complaint represents an actual, genuine, and justiciable controversy between them regarding their respective obligations to one another relative to municipal emergency dispatching.

35. That [d]efendant is not entitled to a defense of sovereign immunity because by attempting to force the [p]laintiff to pay for municipal dispatching services, [d]efendant is acting contrary to statutory authority and unlawfully seeking to tax [p]laintiff with costs that [d]efendant is required to bear.

36. It is necessary and proper for this [c]ourt to determine the rights, obligations, and duties of the parties in relation to applicable North Carolina law, pursuant to North Carolina's Declaratory Judgment Act, [N.C.G.S] § 1-253 et seq.

37. Plaintiff prays that the [c]ourt enter an order declaring that [d]efendant is required to provide dispatching services for [p]laintiff and [p]laintiff's public safety agencies, and declaring that [p]laintiff is not required to pay or reimburse [d]efendant for any costs related to the provision of these services.

As our Supreme Court held, "the mere filing of a declaratory judgment action is not sufficient, on its own, to grant a plaintiff standing." *United Daughters of the Confederacy*, 383 N.C. at 629. Conclusory statements—such as asserting an "actual controversy" or a "genuine and justiciable dispute"—are not enough. Plaintiff must show a legal or factual injury caused by defendant's actions to maintain a declaratory judgment action. *Id.*

Under the UDJA, "[a]ny person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." § 1-254. The central question, then, is: What statutory right does plaintiff claim, how has defendant allegedly infringed it, and by

what action? As our Supreme Court explained in *United Daughters of the Confederacy*, plaintiff "has failed to identify any legal right conferred by the common law, statute, or constitution of which they have been deprived." 383 N.C. at 629.

The closest plaintiff comes to asserting a statutory right is its allegation that, under Chapter 143B and related administrative code provisions, defendant is required to provide dispatch services to plaintiff's agencies at no cost. However, plaintiff fails to identify a specific statute conferring this right or a private cause of action to enforce it. Instead, plaintiff simply asserts that the trial court must determine the parties' rights under the UDJA. While the UDJA is remedial and to be liberally construed, N.C.G.S. § 1-264, it does not grant courts unlimited authority to issue advisory opinions. *Tryon v. Power Co.*, 222 N.C. 200, 203–04 (1942). Plaintiff's request seeks precisely that—an abstract declaration of what the law is, untethered to a demonstrated legal injury.

In both its complaint and oral argument, plaintiff suggests that the General Assembly's 2010 amendment to what is now N.C.G.S. § 143B-1400(7) is central to its claim for declaratory relief. Section 143B-1400 defines terms for Article 15, Part 10, and subsection (7) defines "call taking" to include dispatching 911 information to the appropriate responder. N.C.G.S. § 143B-1400(7) (2022). Plaintiff notes the 2010 removal of the phrase "up to the point of dispatch" and argues this reflects legislative intent to require PSAPs to dispatch calls regardless of which agency employs the responders. On appeal, plaintiff contends this statutory change "weighs

significantly" on the issue and that the case turns on statutory interpretation.

If this case truly turns on statutory interpretation, plaintiff makes little effort to apply traditional tools of statutory construction in its briefing or at oral argument. Section 143B-1400(7) merely defines "call taking." While plaintiff's complaint references the legislature's "deliberate intention," its brief asserts the plain meaning of both § 143B-1400(7) and the term "appropriate responder" is unambiguous. Plaintiff also argues that the plain meaning of § 143B-1402 and 09 N.C. Admin. Code 06C .0103 (2016) mandates that a PSAP dispatch calls directly to field personnel employed to respond to emergencies.

Defendant does not dispute the plain meaning of § 143B-1400(7). In its answer, defendant acknowledges that the definition of "call taking" stands on its own but rejects any interpretation beyond the text, including plaintiff's reference to legislative intent. Defendant continues to provide call taking services for plaintiff's emergency agencies and denies any intent to deviate from its statutory duty. Notably, defendant asserts there is no justiciable controversy regarding its obligation to provide such services and argues the court lacks subject matter jurisdiction to issue a declaratory judgment on that issue. The real dispute concerns whether plaintiff must pay for PSAP services—not whether defendant must continue providing them.

"Even if N.C.G.S. § [143B-1400(7)] applies in the set of circumstances that is before us in this case, we are unable to conclude that it confers any legal rights upon plaintiff sufficient to give rise to any sort of . . . valid legal claim." *United Daughters*

- 18 -

*of the Confederacy*, 383 N.C. at 637. "We are unable to identify anything in N.C.G.S. § [143B-1400(7)], particularly when read in conjunction with the allegations of the . . . complaint, that explicitly authorizes the assertion of a private cause of action for the purpose of enforcing that statutory provision." *Id.* at 638. Finally, even if N.C.G.S. § [143B-1400(7)] could be interpreted to implicitly authorize the assertion of a private right of action, nothing in the relevant statutory language or the allegations contained in the . . . complaint suggests that plaintiff would be in the class of persons on which the statute confers the right." *Id.* (cleaned up).

As discussed, § 143B-1400(7) is a definitional provision. It does not address funding obligations, provide a cost-sharing formula, or guide the trial court in resolving the funding dispute. No statute expressly requires PSAP providers to bear all operational costs or absolves local governments, who are required to participate in a PSAP, *see* § 143B-1406(h), from contributing. Where a statute's language is clear but incomplete, courts may not supply missing terms. *See Appalachian Materials, LLC v. Watauga Cnty.*, 262 N.C. App. 156, 163 (2018) (stating that "[c]ourts do not possess the authority to insert language into a[] . . . statute that *could* have been included therein but was not."). Moreover, a list of statutory definitions "is not self-executing in that no enforcement mechanism is provided under its terms . . . [and] [a] mere expression of legislative policy, without more, is not sufficient to support the recognition of a right on the part of any particular party to assert a private right of action." *United Daughters of the Confederacy*, 383 N.C. at 638 n.12 (internal

quotation marks omitted).

To establish standing in a declaratory judgment action, "[i]t is not necessary that one party have an actual right of action against another, but *there must be more than a mere disagreement.*" *N.C. Farm Bureau Mut. Ins. Co. v. Warren*, 89 N.C. App. 148, 150 (1988) (emphasis added). As our Supreme Court has acknowledged, determining whether a justiciable controversy exists is not always easy, but the jurisdictional requirement is clear: litigation must appear unavoidable. *Sharpe v. Park Newspapers*, 317 N.C. 579, 589 (1986). A mere threat of suit is insufficient to create jurisdiction. *Warren*, 89 N.C. App. at 150. Here, plaintiff claims entitlement to PSAP services at no cost, while defendant disagrees. But to establish standing and a ripe controversy, plaintiff must show more than a policy disagreement.

Assuming, *arguendo*, that plaintiff has a right to free PSAP services and that § 143B-1400(7) creates a private cause of action, defendant continues to provide those services despite its expectation of repayment. What injury, then, has plaintiff actually sustained, and from what action by defendant? Plaintiff asserts in its complaint:

> 27. Plaintiff has made several attempts to negotiate an alternative resolution to this situation, which have been rejected by [d]efendant. Defendant's formal rejection of alternative proposals was sent to [p]laintiff on [3 February 2022], and is attached and incorporated hereto as Exhibit F. In this letter, [d]efendant's counsel states that should the [p]laintiff continue to refuse to accept the Proposed Agreement, the [d]efendant will nonetheless "invoice and expect reimbursement" for the costs related to municipal

dispatching.

> 28. On [7 April 2022], the Halifax County Manager transmitted to [p]laintiff on behalf of [d]efendant a letter which is attached and incorporated hereto as Exhibit F. In this letter, [d]efendant's County Manager indicates that [d]efendant will invoice the [p]laintiff $406,363.00 for 911 services for the 2022-2023 fiscal year.

> . . . .

> 32. That upon information and belief, should [p]laintiff fail to agree to the terms of [d]efendant's Proposed Agreement, [d]efendant will invoice [p]laintiff for an amount of costs to be determined by [d]efendant, and will likely take steps to recover it.

It is unclear how the mere anticipation of an invoice amounts to a legal or factual injury traceable to defendant's conduct sufficient to confer jurisdiction under the UDJA. In *United Daughters of the Confederacy*, even where the City's letter suggested potential legal action if the monument was not removed voluntarily, the Court found no actual threat of suit or direct action against the plaintiff. 383 N.C. at 633.

Even assuming, *arguendo*, that receiving an invoice could establish injury, our Supreme Court requires that an actual controversy exist both when the action is filed and at the time of hearing. *Sharpe*, 317 N.C. at 585. Courts may not consider controversies arising only after the pleadings are filed. *Id.* Here, plaintiff filed its complaint on 3 May 2022. The record includes two invoices dated 6 July and 26 September 2022, attached to an affidavit filed on 8 December 2022—but there is no

evidence that defendant transmitted them to plaintiff before the suit was filed. Plaintiff acted preemptively, relying only on "information and belief," speculation, and anticipated harm.

While "[a] declaratory judgment is particularly appropriate to determine the constitutionality of a statute," *Woodard v. Carteret Cnty.*, 270 N.C. 55, 60 (1967), no party here has challenged the validity of § 143B-1400(7) or any other statute. *See United Daughters of the Confederacy*, 383 N.C. at 626 n.7. Moreover, where a statute is alleged to be unconstitutional, § 1-260 requires that the Attorney General be served and allowed to be heard—yet neither party named the State, served it, or moved for its participation.

We do not reach the broader question of joinder but note that § 1-260 also mandates joinder of all persons whose rights would be affected by a declaration and prohibits judgments that prejudice nonparties. The record includes a "Stipulations Regarding Non-Joinder of Other Parties," in which other Halifax County municipalities—those that currently or may in the future rely on PSAP services— agree to be bound by the outcome as though they had participated.

But this is not a narrow, local dispute over a municipal ordinance or franchise. Rather, the parties raise broad claims under North Carolina's statutory framework governing PSAPs, and any ruling may affect the rights and obligations of PSAP providers and participants statewide. As our courts have explained, "necessary parties" include all persons with a material interest in the subject matter who would

be directly affected by the judgment. *N.C. Monroe Constr. Co. v. Guilford Cnty. Bd. of Educ.*, 278 N.C. 633, 639–40 (1971). A declaratory judgment should not issue in their absence. We question, then, how the parties can claim that only Halifax County municipalities would be affected by this outcome. We digress.

Ultimately, "a plaintiff must identify a cognizable legal right of which it was allegedly deprived by the defendant's actions" to establish standing for declaratory relief. *United Daughters of the Confederacy*, 383 N.C. at 637 (cleaned up). Even assuming § 143B-1400(7) is at issue, plaintiff has not shown—either in its complaint or on appeal—that the statute confers a cognizable right, includes a self-executing enforcement mechanism, or that defendant infringed any such right. *Id.* at 638 n.12. Plaintiff has therefore failed to establish standing. At the time of filing, no justiciable controversy existed under the UDJA. Accordingly, the trial court properly denied plaintiff's motion for summary judgment for lack of subject matter jurisdiction to declare plaintiff's rights under North Carolina law.

**2.**

We now turn to whether defendant has established standing to maintain its counterclaim for declaratory judgment. Here too, defendant has "failed to identify any legal right conferred by the common law, statute, or constitution of which they have been deprived by . . . [plaintiff's] conduct." *Id.* at 629. Accordingly, the trial court erred in granting summary judgment in defendant's favor on that basis.

Defendant asserts in its Answer, in part:

FURTHER RESPONDER to the complaint, by way of COUNTERCLAIM for declaratory judgment, the [d]efendant alleges and says:

. . . .

48.  Article V, Sec. 2(5) of the North Carolina Constitution says:

*Purposes of property tax. The General Assembly shall not authorize any county, city or town, special district, or other unit of local government to levy taxes on property, except for purposes authorized by general law uniformly applicable throughout the State, unless the tax is approved by a majority of the qualified voters of the unit who vote thereon.*

49.  As to counties, the "general law uniformly applicable throughout the State" is G.S. 153A-149. Under G.S. 153A-149, counties do not have statutory authority to levy and expend property taxes for a 911 system (of "PSAP") or participation in a 911 system. That is to say, 911 systems are not among the "purposes" listed in either subsection (b) or (c) of G.S. 153A-149.

50.  As to cities (or towns), the general law uniformly applicable throughout the State" is G.S. 160A-209. Under G.S. 160A-209, cities do not have statutory authority to levy or expend property taxes for a 911 system (or "PSAP") or participation in a 911 system. That is to say, 911 systems are not among the "purposes listed in either subsection (b) or (c) of G.S. 160A-209.

51.  Notwithstanding the absence of statutory authority to spend property tax revenues on a 911 system, a county can levy and spend property taxes for ambulance services, rescue squads and other emergency medical services (G.S. 153A-149(c)(5)), fire protection services (G.S. 153A-149(c)(11)), and operation of the county sheriff's office for law enforcement (G.S. 153A-149(c)(18)). Part of the necessary cost of providing each of these county public safety functions includes the cost of participating in a 911 system, as required under G.S. 143B-1406(h).

52.  Likewise, notwithstanding the absence of statutory authority to spend property tax revenues on a 911 system of participation in a 911 system, a city can levy and spend property taxes for ambulance services, rescue squads and other emergency medical services (G.S. 160A-209(c)(4)), fire protection services (G.S. 160A-209(c)(13)), and police/law enforcement (G.S. 160A-209(c)(26)).  Part of the necessary cost of providing each of these city public safety functions includes the cost of participating in a 911 system, as required under G.S. 143B-1406(h).

53.  The [d]efendant acknowledges the language of G.S. 153A-149(d), the first sentence of which reads: "With an approving vote of the people, any county may levy property taxes for any purpose for which the county is authorized by law to appropriate money."  One might conclude that by county-wide referendum the voters could approve the expenditure of county property tax revenues to cover that portion of the cost of the 911 system that the [p]laintiff no longer wants to fund.  However, because [d]efendant is not authorized by law to appropriate money in support of the [p]laintiff's municipal law enforcement and fire protection services, the voters have no authority to approve such a measure.

. . . .

55.  There is no direct statutory authority for counties or cities to establish, operate, fund or borrow money for 911 systems (or PSAPs).  The lawful ability to establish, operate and fund 911 systems (or participation in 911 systems) is derived from the statutory authority to establish, operate, fund and borrow money for capital improvements related to law enforcement, fire and rescue services.

## Conclusion

56.  The [p]laintiff's financial obligation with regard to 911 services is a necessary part of its costs of providing municipal law enforcement and fire protection services.  If the [p]laintiff avoids (or is allowed to avoid) its financial

obligation with regard to 911 services, that part of its cost of providing municipal police and fire department services is potentially laid at the feet of all county taxpayers. While it is true that the [d]efendant is required to provide call taking for the [p]laintiff's police and fire departments, it is equally true that the [p]laintiff is required to include the proportional cost of its participation in a 911 system in its municipal police and fire department budgets. The [d]efendant has no statutory or constitutional authority to absorb that portion of the [p]laintiff's cost of providing municipal police and fire protection services.

WHEREFORE, the [d]efendant respectfully prays the [c]ourt as follows:

. . . .

5. That declaratory judgment be entered in favor of the [d]efendant declaring that because the [d]efendant is without statutory authority to appropriate money in support of [p]laintiff's municipal public safety agencies, and because [p]laintiff is statutorily required to participate in a 911 system, [p]laintiff is required to pay or reimburse a proportionate share of the cost of the 911 system (PSAP) operated by the [d]efendant, except for those costs paid for by 911 Fund appropriations.

. . . .

7. For such other and further relief as the [c]ourt deems just and proper.

The flaw in defendant's claim for declaratory relief is clear. As discussed, a declaratory judgment is a statutory remedy that permits courts to "declare rights, status, and other legal relations," N.C.G.S. § 1-253, only when "an actual controversy" exists at the time the action is filed, *Town of Pine Knoll Shores v. Carolina Water Serv.*, 128 N.C. App. 321, 321 (1998). In determining whether such a controversy

exists, we apply the following principles governing the scope of the Act, *see Kirkman v. Kirkman*, 42 N.C. App. 173, 176 (1979):

> [The UDJA] does not undertake to convert judicial tribunals into counsellors and impose upon them the duty of giving advisory opinions to any parties who may come into court and ask for either academic enlightenment or practical guidance concerning their legal affairs. This observation may be stated in the vernacular in this wise: The Uniform Declaratory Judgment Act does not license litigants to fish in judicial ponds for legal advice.
>
> . . . .
>
> While the Uniform Declaratory Judgment Act thus enables courts to take cognizance of disputes at an earlier stage than that ordinarily permitted by the legal procedure which existed before its enactment, it preserves inviolate the ancient and sound juridic concept that the inherent function of judicial tribunals is to adjudicate genuine controversies between antagonistic litigants with respect to their rights, status, or other legal relations. This being so, an action for a declaratory judgment will lie only in a case in which there is an actual or real existing controversy between parties having adverse interests in the matter in dispute. It necessarily follows that when a litigant seeks relief under the declaratory judgment statute, he must set forth in his pleading all facts necessary to disclose the existence of an actual controversy between the parties to the action with regard to their respective rights and duties . . . .

*Lide*, 231 N.C. at 117–18 (internal quotation marks and citations omitted).

Here, defendant cites North Carolina law that may be generally relevant to the dispute, but it fails to identify any statute that confers standing to challenge plaintiff's refusal to contribute to PSAP costs.

The first component of defendant's requested declaration seeks a determination that it lacks statutory authority to fund plaintiff's public safety agencies. But this presents a hypothetical question—whether a course of action defendant has not taken would be unlawful. In doing so, defendant positions itself as adverse to its own potential conduct, not to plaintiff or any proper party. This amounts to a request for an advisory opinion based on an abstract scenario. As this Court has explained, "declaratory judgments should not be made 'in the air' . . . without definite concrete application to a particular state of facts." *Augur v. Augur*, 356 N.C. 582, 588 (2002) (cleaned up); *see also Raleigh v. Norfolk S. R. Co.*, 275 N.C. 454, 464 (1969); *Equity Sols. of the Carolinas, Inc. v. N.C. Dep't of State Treasurer*, 232 N.C. App. 384, 396 (2014). Defendant has not shown any impairment of a legal right necessary to support standing.

Defendant next seeks a declaration that plaintiff is "statutorily required to participate in a 911 system." While § 143B-1406(h) states that "[e]very local government shall participate in a 911 system," this provision does not appear to be the core of the parties' dispute. Defendant does not argue that § 143B-1406(h) imposes a financial obligation on plaintiff, that it is self-executing or creates a private right of action, *see United Daughters of the Confederacy*, 383 N.C. at 638, or that defendant is among the class the statute is intended to benefit. Nor has defendant claimed that the term "participate" is ambiguous or raised any issue of statutory construction or validity.

Finally, defendant asks the trial court to declare that plaintiff is legally obligated to pay a proportionate share of PSAP costs not covered by 911 Fund appropriations. But this conclusion rests on inference, not on any statutory mandate. Even if defendant's earlier reasoning were accepted, the following remains true: defendant has not (i) identified a statute that expressly imposes a financial obligation on plaintiff; (ii) cited any law guaranteeing defendant the right to reimbursement for PSAP costs; (iii) alleged that plaintiff violated such a right; or (iv) shown standing to assert a claim under any such statute. Like plaintiff, defendant has "failed to allege the infringement of a legally enforceable right sufficient to establish standing." *United Daughters of the Confederacy*, 383 N.C. at 650.

## III.

Neither party has established standing to seek declaratory relief under the UDJA. Plaintiff failed to identify a cognizable legal right or show a legal injury attributable to defendant's conduct. Likewise, defendant's counterclaim rests on hypothetical and unsupported assertions, without reference to any statute conferring a legally enforceable right or providing a private cause of action. Because no justiciable controversy existed at the time of filing, the trial court properly denied plaintiff's motion for summary judgment but erred in granting summary judgment in defendant's favor.

Accordingly, we affirm the trial court's order denying plaintiff's motion for summary judgment and reverse the portion of the order granting summary judgment

to defendant on its counterclaim.


AFFIRMED IN PART AND REVERSED IN PART.

Judges COLLINS and FLOOD concur.

Report per Rule 30(e).